# EXHIBIT C



Clerk of the Superior Court
*** Electronically Filed ***
A. Marquez, Deputy
12/3/2021 11:57:36 AM
Filing ID 13677277

BOURQUE LAW FIRM, P.C.
Arthur J. Bourque (No. 013773)
1819 East Morten, Suite 280
Phoenix, Arizona  85020
Telephone: (602) 559-9550
art@bourquelaw.com

Attorneys for Plaintiffs

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| RECOVERY HOUSING ACADEMY, LLC, an Arizona limited liability company; RAL ACADEMY, LLC, an Arizona limited liability company; MONA GUARINO; and ISABELLE GUARINO,<br><br>Plaintiffs,<br><br>v.<br><br>FRANK CANDELARIO and SHERRI CANDELARIO, husband and wife; SHARED HOUSING SOLUTIONS, LLC,<br><br>Defendants. | Case No. **CV2021-054227**<br><br>**VERIFIED COMPLAINT**<br><br>(Commercial Court Assignment Requested) |

Plaintiffs Recovery Housing Academy, LLC, RAL Academy, LLC, Mona Guarino, and Isabelle Guarino (collectively "Plaintiffs") allege:

1.     Recovery Housing Academy, LLC ("Recovery Housing Academy") is an Arizona limited liability company located in Maricopa County, Arizona.

2.     Plaintiff RAL Academy, LLC ("RAL Academy") is an Arizona limited liability company located in Maricopa County, Arizona.

3.     Plaintiff Mona Guarino is an Arizona resident living in Maricopa County.

4.     Plaintiff Isabelle Guarino is an Arizona resident living in Maricopa County.

5.     Upon information and belief, Defendants Frank Candelario and Sherri

Candelario (collectively, the "Candelarios") are husband and wife and Florida residents.

6.      Upon information and belief, Defendant Shared Housing Solutions, LLC is a Washington state limited liability company and is owned and controlled by the Candelarios (the Candelarios and Shared Housing Solutions, LLC are collectively referred to as "Defendants").

7.      Defendants have caused acts and events to occur in Maricopa County out of which this Complaint arises.

8.      This Court has personal and subject matter jurisdiction over the Defendants and claims set forth herein and venue in Maricopa County is proper.

9.      In February 2021, Recovery Housing Academy (formerly named Shared Housing Academy) and RAL Academy entered into an Independent Contractor Agreement (the "Agreement") with Defendants.

10.     Attached as Exhibits 1 and 2 is the Agreement (there are two Exhibits because each Candelario signed a separate copy of the Agreement).

11.     Frank Candelario's signature appears on one copy of the Agreement and Sherri Candelario's signature appears on the other copy of the Agreement.

12.     Frank Candelario emailed the signed (by Frank and Sherri Candelario) Agreement to Gene Guarino, then owner and Manager of Plaintiffs Recovery Housing Academy and RAL Academy, in Arizona, and Isabelle Guarino, in Arizona.

13.     Gene Guarino signed the Agreement in Arizona.

14.     The Agreement states, among other things:

> The purpose of this agreement is to outline the creation, use and sale of a Shared Housing suite of products and offerings.  This will include

a Shared Housing Home Study Course, a 3-Day Shared Housing training, a coaching / support product, a continuation of support and a limited license to use the name "Kate's House Foundation or Kate's House" or any derivative of that name.  Additional products and services may be offered in the future as well.

15.    In February 2021, the Candelarios traveled to Arizona.

16.    The main purpose of the Candelarios' February 2021 trip to Arizona was to meet with Gene Guarino and present the live three-day training course referenced in the Agreement.

17.    Prior to the presentation of the live three-day training course, the Candelarios and Gene Guarino collaborated to create the PowerPoint presentation to be used at the live three-day training course.

18.    Prior to the presentation of the live three-day training course, the Candelarios and Gene Guarino collaborated to create the substance and content of the live three-day training course.

19.    Plaintiffs Recovery Housing Academy's and RAL Academy's business studio and equipment in Gilbert, Arizona were used to create and record the live three-day training course.

20.    Plaintiffs Recovery Housing Academy and RAL Academy employees and agents in Gilbert, Arizona were used to help create and produce the live three-day training course.

21.    Plaintiff Recovery Housing Academy paid the Candelarios $5,000 to present the live three-day training course.

22.    Plaintiff Recovery Housing Academy paid the Candelarios additional

compensation for the live three-day training course in the form of (1) commissions on revenue received from Plaintiff's products purchased by training course attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiff.

23.    In May, 2021, the Candelarios again traveled to Arizona.

24.    The main purpose of the Candelarios' May 2021 trip to Arizona was to meet with Gene Guarino and present the live three-day training course referenced in the Agreement.

25.    Prior to the presentation of the May 2021 live three-day training course, the Candelarios and Gene Guarino collaborated to improve the existing PowerPoint presentation to be used at the live three-day training course.

26.    Prior to the presentation of the May 2021 live three-day training course, the Candelarios and Gene Guarino collaborated to improve the substance and content of the live three-day training course.

27.    Plaintiffs Recovery Housing Academy's and RAL Academy's business studio and equipment in Gilbert, Arizona were used to create and record the May 2021 live three-day training course.

28.    Plaintiffs Recovery Housing Academy's and RAL Academy's employees and agents in Gilbert, Arizona were used to help create and produce the May 2021 live three-day training course.

29.    Plaintiff Recovery Housing Academy paid the Candelarios $5,000 to present the May 2021 live three-day training course.

30.     Plaintiff Recovery Housing Academy paid the Candelarios additional compensation for the May 2021 live three-day training course in the form of (1) commissions on revenue received from Plaintiff's products purchased by training course attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiff.

31.     While in Arizona during their May 2021 trip, the Candelarios signed an Amendment to the Contract, which is attached as Exhibit 3.

32.     In June 2021, Sherri Candelario visited Arizona again.

33.     The main purpose of Sherri Candelario's June 2021 trip to Arizona was to meet with Gene Guarino and collaborate on improving the live three-day training course.

34.     In July 2021, the Candelarios again traveled to Arizona.

35.     The main purpose of the Candelarios' July 2021 trip to Arizona was to meet with Gene Guarino and present the live three-day training course referenced in the Agreement.

36.     Prior to the presentation of the July 2021 live three-day training course, the Candelarios and Gene Guarino collaborated to improve the existing PowerPoint presentation to be used at the live three-day training course.

37.     Prior to the presentation of the July 2021 live three-day training course, the Candelarios and Gene Guarino collaborated to improve the substance and content of the live three-day training course.

38.     Plaintiffs Recovery Housing Academy's and RAL Academy's business studio and equipment in Gilbert, Arizona were used to create and record the July 2021 live

three-day training course.

39.     Plaintiffs Recovery Housing Academy's and RAL Academy's employees and agents in Gilbert, Arizona were used to help create and produce the July 2021 live three-day training course.

40.     Plaintiff Recovery Housing Academy paid the Candelarios $5,000 to present the July 2021 live three-day training course.

41.     Plaintiff Recovery Housing Academy paid the Candelarios additional compensation for the July 2021 live three-day training course in the form of (1) commissions on revenue received from Plaintiff's products purchased by training course attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiff.

42.     In August 2021, Sherri Candelario again traveled to Arizona.

43.     The main purpose of Sherri Candelario's August 2021 trip to Arizona was to and present the live three-day training course referenced in the Agreement (Frank Candelario could not make this trip and assisted remotely, taking advantage of Plaintiffs' business studio and equipment).

44.     Prior to the presentation of the August 2021 live three-day training course, the Candelarios and Gene Guarino collaborated to improve the existing PowerPoint presentation to be used at the live three-day training course.

45.     Prior to the presentation of the August 2021 live three-day training course, the Candelarios and Gene Guarino collaborated to improve the substance and content of the live three-day training course.

46.     Plaintiffs Recovery Housing Academy's and RAL Academy's business studio and equipment in Gilbert, Arizona were used to create the August 2021 live three-day training course.

47.     Plaintiffs Recovery Housing Academy's and RAL Academy's employees and agents in Gilbert, Arizona were used to help create and record the August 2021 live three-day training course.

48.     Plaintiff Recovery Housing Academy paid the Candelarios $5,000 to present the August 2021 live three-day training course.

49.     Plaintiff Recovery Housing Academy paid the Candelarios additional compensation for the August 2021 live three-day training course in the form of (1) commissions on revenue received from Plaintiff's products purchased by training course attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiff.

50.     In October 2021, the Candelarios again came to Arizona, paid for by Plaintiff Recovery Housing Academy, to advertise the live three-day training course at the RAL National Convention.

51.     In late September 2021, Gene Guarino became ill from Covid-19 and passed away on October 13, 2021.

52.     Following Gene Guarino's death, Defendants engaged in a series of malicious acts and misconduct intended to breach the Agreement, injure Plaintiffs, and take advantage of Gene Guarino's death.

53.     Prior to Gene Guarino's death, Defendants had agreed and promised to travel

to Colorado, paid for by Plaintiff Recovery Housing Academy, to advertise the live three-day training course at an event sponsored by the Investment Community of the Rockies, LLC ("ICOR").

54.     Plaintiff Recovery Housing Academy relied on Defendants' agreement and promise to travel to Colorado in November 2021, paid for by Plaintiff, to advertise the live three-day training course.

55.     Plaintiff Recovery Housing Academy's reliance included, among other things, entering into an agreement with ICOR.

56.     Defendants failed to honor their agreement and promise to travel to Colorado in November 2021, paid for by Plaintiff Recovery Housing Academy, to advertise the live three-day training course with ICOR by, among other things, failing to appear on the first day, Sherri Candelario failing to appear at all, and Frank Candelario appearing on the second day but conducting himself unprofessionally.

57.     As a result of Defendants' failure to honor their agreement and promise at the ICOR meeting, ICOR contacted AZ-REIA and suggested that AZ-REIA terminate Plaintiffs' January 2022 presentation, which will cause significant losses for Plaintiffs.

58.     Defendants' ICOR misconduct has resulted in ICOR demanding damages from Plaintiff Recovery Housing Academy and possibly banning Plaintiff Recovery Housing Academy from all REIA groups across the country.

59.     On November 11, 2021, Sherri Candelario stated on a recorded call with Plaintiff representatives Mona Guarino and Isabelle Guarino that "that consulting agreement that's an independent contractor agreement doesn't work for us [Sherri and

Frank Candelario]… and we're just not doing it anymore."

60.     As the November 11, 2021, call continued, Isabelle Guarino requested that (1) Defendants follow through with their promise and commitment to conduct the scheduled live three-day training event in December 2021 or allow the use of the recorded previous training; (2) Defendants complete the coaching and consulting that Defendants had promised to complete and that Defendants had been paid for under the Agreement; and (3) Defendants provide a termination letter if they wished to discontinue providing independent contractor services.

61.     Following Isabelle Guarino's request, Sherri Candelario stated and promised on the November 11, 2021, call that (1) Defendants would follow through with their promise and commitment to conduct the scheduled live three-day training event in December 2021 or  allow the use of the recorded previous training; (2) Defendants would complete the coaching and consulting that Defendants had promised to complete (and that Defendants had been paid for under the Agreement); and (3) Defendants would provide a termination letter.

62.     On November 19, 2021, Defendants' counsel sent a "Termination Letter" to Mona Guarino, Isabelle Guarino, and Gene Guarino's son, Emmanuel, falsely stating, among other things:

> Upon RAL Academy's urgent requests for Sherri and Frank to immediately terminate their Agreement after RAL Academy founder Eugene Guarino's ("Gene") unexpected passing last month, Sherri and Frank hereby submit this termination letter.

63.     Defendants knew that Defendants' counsel's "Termination Letter" misrepresented that RAL Academy "urgently requested" that the Agreement be terminated

when, in truth, Sherri Candelario indicated on a recorded call that the "independent contractor agreement doesn't work for us [Sherri and Frank Candelario]... and we're just not doing it anymore."

64.   Defendants also knew that Defendants' counsel's "Termination Letter" misrepresented that "Since Gene's passing, new leadership at RAL Academy has attempted to control how Sherri and Frank speak, teach, coach and mentor."

65.   Despite Sherri Candelario's promises and representations on the November 11, 2021 call that (1) Defendants would follow through with their promise and commitment to conduct the scheduled live three day training event in December 2021 or allow the use of the recorded previous training; (2) Defendants would complete the coaching and consulting that Defendants had promised to complete (and that Defendants had been paid for under the Agreement); and (3) Defendants would provide a termination letter, Defendants failed to follow through with their promise and commitment to conduct the scheduled live three-day training event in December 2021 or allow the use of the recorded previous training and complete the coaching and consulting that Defendants had promised to complete (and that Defendants had been paid for under the Agreement).

66.   Defendants' failure to follow through with their promise and commitment to conduct the scheduled live three-day training event in December 2021 or allow the use of the recorded previous training and complete the coaching and consulting that Defendants had promised to complete (and that Defendants had been paid for under the Agreement) caused Plaintiffs to suffer significant damages.

67.   On November 23, 2021, Defendant Sherri Candelario emailed Anera Shell

and stated:

> We did not have a business issue with RAL. We were terminated and we believe it is due to a restructuring that was required by the company following Gene's passing. We have no information as to why it happened as we had a full class for December. Please see the attachment email below from Isabelle Guarino requesting we terminate.

> We cannot and will not be blamed for RAL's decisions, particularly when we have no knowledge as to why they are making business decisions that affect our ability to fulfill our commitments.

> We received the email from Frank Harris stating there was a business issue. There was no business issue.

> RAL asked Frank and I to terminate our consulting agreement with RAL last week. We did not quit. We were fired. Please see Isabelle's request in italics.

> Please have any students call us if there are questions. We created the class and all of the materials. We will likely offer a training independently in 2022.

> We have no visibility into their business, probate issues or even if this is due to grief over the loss of their parent.

> We too, were blindsided.

68.   Sherri Candelario's email contains malicious falsehoods intended to exploit and capitalize on Gene Guarino's death for profit at Plaintiffs' expense and is depraved.

69.   On November 23, 2021, Defendant Sherri Candelario emailed Frank Harris and stated:

> Hi Frank: We shared with Anera that this is not a business issue between us and Shared Housing Academy.

> Isabelle Guarino requested we terminate our contract last week. There is a lot going on in the family and the business after the death of their dad. We have no visibility into why they needed to cut ties, but we know it would not have happened if Gene had not died unexpectedly.

Frank, Gene and I had big plans to go national with the model of shared housing Frank and I created.

We have been teaching this class for many years and will teach independently in 2022. We would like to have you on our mailing list and stay in touch. We will help you.

70.    Sherri Candelario's email contains malicious falsehoods intended to exploit and capitalize on Gene Guarino's death for profit at Plaintiffs' expense and is depraved.

71.    Defendants have spread malicious falsehoods to multiple other people intended to exploit and capitalize on Gene Guarino's death for profit at Plaintiffs' expense, including but not limited to (1) contacting independent contractors that provide support to Plaintiff Recovery Housing Academy, resulting in the independent contractors severing their business relationships with Plaintiff Recovery Housing Academy, which has caused Plaintiff Recovery Housing Academy to suffer significant damages; (2) contacting Plaintiff Recovery Housing Academy's customers, causing them to demand refunds from Plaintiff Recovery Housing Academy; and (3) contacting industry organizations with the intent of causing them to sever relationships with Plaintiffs.

**COUNT ONE**
**(Intentional Interference with Contract**
**and Prospective Contractual Relations)**

72.    Plaintiffs incorporate by reference the allegations above.

73.    Plaintiff Recovery Housing Academy has a valid contractual relationship or business expectancy with customers, independent contractor support providers, and industry organizations.

74.    Defendants know of Plaintiff Recovery Housing Academy's contractual relationship or business expectancy with customers, independent contractor support

providers, and industry organizations.

75.    Defendants' intentional interference has induced or caused a breach or termination of Plaintiff Recovery Housing Academy's contractual relationship or business expectancy with customers, independent contractor support providers, and industry organizations

76.    Plaintiff Recovery Housing Academy has suffered resultant damages.

77.    Defendants' interference was and is improper as to motive and means.

78.    By reason of the evil motive and malice of Defendants, Plaintiffs request punitive damages.

**COUNT TWO**
**(Defamation)**

79.    Plaintiffs incorporate by reference the allegations above.

80.    Defendants published false and defamatory statements set forth in paragraphs 67 and 69, above.

81.    Upon information and belief, Defendants have published the same or substantially similar false and defamatory statements, both verbally and in writing, to numerous others.

82.    Defendants' publications as set forth above contain false and defamatory statements of fact of and concerning Plaintiffs that were authored and published by Defendants.

83.    Each of the statements published by Defendants are factually false, and to the extent any of Defendants' statements appear to convey an opinion, they are actionable because they imply the existence of additional undisclosed facts which are false.

84.    Defendants' statements are false and defamatory because, among other things, they bring Plaintiffs into disrepute, contempt, or ridicule.

85.     Defendants are liable not only for what was said, but also for what was insinuated.

86.     Defendants made each and every defamatory statement published knowing that said statements were false.

87.     In the alternative, Defendants acted in a reckless disregard of the truth in making each of the defamatory statements; in the alternative, Defendants were negligent in failing to ascertain the truth of the defamatory statements before making them.

88.     Each of the statements were published by Defendants by reason of evil motives and/or malice towards Plaintiffs and were and are intended and designed to and did injure and defame and continue to injure and defame Plaintiffs.

89.     Defendants' statements, singularly or in combination, have exposed and continue to expose Plaintiffs to public contempt.  The statements have impeached and continue to impeach the morality, honesty, business and other competence, and integrity of Plaintiffs, have damaged Plaintiffs' personal and professional reputations, and have subjected them to ridicule in the eyes of customers, independent contractors, industry organizations, friends, acquaintances, and the general public.

90.     Defendants' statements, singularly or in combination, have also caused the Plaintiffs to suffer economic harms, damages, and losses.

91.     Defendants' statements constitute defamation per se.

92.     By reason of the evil motives and malice of Defendants, Plaintiffs pray for punitive damages.

## COUNT THREE
### (False Light)

93.     Plaintiffs incorporate by reference the allegations above.

94.     Plaintiffs were placed in a false light before the public as a result of Defendants' actions in authoring and publishing the subject statements to third parties.

95.     The false light in which Plaintiffs were placed would be highly offensive to a reasonable person.

96.     Defendants knew that the statements and impressions they made were false, or Defendants acted in a reckless disregard to the truth or falsity of the statements and implications they made.

97.     Plaintiffs were damaged by said actions, as above described.

98.     Each of the statements were published by Defendants by reason of evil motives and/or malice towards Plaintiffs and were and are intended and designed to and did injure and defame and continue to injure and defame Plaintiffs.

99.     By reason of the evil motives and malice of Defendants, Plaintiffs pray for punitive damages.

**COUNT FOUR**
**(Injurious Falsehood)**

100.    Plaintiffs incorporate by reference the allegations above.

101.    Defendants authored and published or caused to be published false, derogatory statements to third parties relating to Plaintiffs' business and professional abilities.

102.    These statements include but are not limited to the statements set forth above.

103.    The statements authored by Defendants were reasonably understood by those who heard them to cast doubt on the quality of Plaintiffs' business practices and services.

104.    The statements made by Defendants were false.

105.    Each and all of the statements were published by Defendants by reason of evil motives and/or malice towards Plaintiffs and were and are intended and designed to and did injure and defame and continue to injure and defame Plaintiffs.

106.    By reason of the evil motives and malice of Defendants, Plaintiffs pray for punitive damages.

**COUNT FIVE**
**(Intentional Infliction of Emotional Distress)**

107.    Plaintiffs incorporate by reference the allegations above.

108.    Defendants' conduct as set forth above was extreme and outrageous.

- 15 -

109.   Defendants either intended to cause emotional distress to Plaintiffs or recklessly disregarded the near certainty that such distress would result from their conduct.

110.   The individual Plaintiffs have suffered severe emotional distress as a result of Defendants' conduct.

111.   As a direct and proximate result of Defendants' conduct, the individual Plaintiffs have suffered damages, and continue to suffer damages, in an amount to be proven at trial.

112.   By reason of the evil motive and malice of Defendants, the individual Plaintiffs request punitive damages.

## COUNT SIX
### (Breach of Contract)

113.   Plaintiffs incorporate by reference the allegations above.

114.   Defendants breached the Agreement by failing to conduct the live three-day training in December 2021.

115.   Defendants breached the Agreement by failing to complete the coaching and consulting that Defendants had promised to complete and that Defendants had been paid for under the Agreement.

116.   Plaintiff Recovery Housing Academy has been damaged by Defendants' breaches in an amount to be proven at trial.

## COUNT SEVEN
### (Breach of the Covenant of Good Faith and Fair Dealing)

117.   Plaintiffs incorporate by reference the allegations above.

118.   Under Arizona law, there is an implied covenant of good faith and fair dealing in every contract.

119.   A party violates this covenant if he or she acts in a manner that denies the

other party the reasonably expected benefits of the contract.

120.   A party also breaches the implied covenant of good faith if he or she uses discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach.

121.   Defendants breached the implied covenant of good faith and fair dealing by failing to conduct the live three-day training in December 2021.

122.   Defendants breached the implied covenant of good faith and fair dealing by failing to complete the coaching and consulting that Defendants had promised to complete and that Defendants had been paid for under the Agreement.

123.   Defendants breached the implied covenant of good faith and fair dealing by terminating the Agreement and then lying to Plaintiff Recovery Housing Academy's customers about the termination in an effort to have the customers demand refunds from Plaintiff Recovery Housing Academy, sever their relationships with Plaintiff Recovery Housing Academy, and/or retain Defendants.

124.   Defendants breached the implied covenant of good faith and fair dealing by terminating the Agreement and then lying to Plaintiff Recovery Housing Academy's independent contractors about the termination in an effort to have the independent contractors sever their relationships with Plaintiff Recovery Housing Academy.

125.   Defendants breached the implied covenant of good faith and fair dealing by terminating the Agreement and then lying to industry organizations about the termination.

126.   Plaintiff Recovery Housing Academy has been damaged by Defendants' breaches of the implied covenant of good faith and fair dealing in an amount to be proven

at trial.

## COUNT EIGHT
### (Declaratory Judgment)

127.    Plaintiffs incorporate by reference the allegations above.

128.    An actual controversy exists between Plaintiffs and Defendants as to the parties' rights, obligations, status, relationships and/or legal relations as described in this Complaint.

129.    This includes an actual controversy regarding the following:

    a.      Which party(s) terminated the Agreement.

    b.      Plaintiff Recovery Housing Academy's ownership, use, and other rights regarding the PowerPoint and other content created for and used at the live three-day training under the Agreement.

    c.      Plaintiff Recovery Housing Academy's ownership, use, and other rights regarding other content created pursuant to the Agreement.

    d.      Plaintiff Recovery Housing Academy's right under the Agreement to the return of money paid to Defendants for coaching and consulting that Defendants failed to perform.

130.    Plaintiff Recovery Housing Academy's is entitled to declaratory relief sought in this action pursuant to A.R.S. § 12-1832.

131.    The declaratory relief sought will terminate the controversy and remove any uncertainty as to the parties' rights, responsibilities and status regarding the Agreement.

132.    Based on the allegations set forth in this Complaint and pursuant to A.R.S. § 12-1831, *et seq*., Plaintiff Recovery Housing Academy's is entitled to receive declaratory

relief from the Court as follows:

        a.     A declaration that Defendants terminated the Agreement.

        b.     A declaration that Plaintiff Recovery Housing Academy has ownership, use, and other rights regarding the PowerPoint and other content created for and used at the live three-day training under the Agreement.

        c.     A declaration that Plaintiff Recovery Housing Academy has ownership, use, and other rights regarding other content created pursuant to the Agreement.

        d.     A declaration that Plaintiff Recovery Housing Academy has the right under the Agreement to the return of money paid to Defendants for coaching and consulting that Defendants failed to perform.

133.    Plaintiffs are entitled to all other supplemental relief, including injunctive relief, that may be or become necessary to enforce the declarations requested herein. The plaintiffs therefore preserve all rights to such supplemental relief, including that provided by A.R.S. § 12-1838.

## COUNT NINE
### (Promissory Estoppel)

134.    Plaintiffs incorporate by reference the allegations above.

135.    Defendants promised Plaintiff Recovery Housing Academy that, among other things, they would (1) travel to Colorado in November 2021, paid for by Plaintiff Recovery Housing Academy, to advertise the live three-day training course; (2) follow through with their promise and commitment to conduct the scheduled live three-day training event in

December 2021 or allow use of the recording; and (3) complete the coaching and consulting that Defendants had promised to complete (and that Defendants had been paid for under the Agreement).

136.   Defendants did foresee or should have reasonably foreseen that their promises would cause Plaintiff Recovery Housing Academy to rely on said promises.

137.   Plaintiff Recovery Housing Academy actually and reasonably relied to its detriment on Defendants' promises and has suffered or will suffer damages including, but not limited to prospective payment to ICOR, lost revenue and profits from the scheduled December 2021 live three-day training, refunds provided to customers, lost revenue from customers who severed their relationships, and amounts to be paid to third parties to fulfill Defendants' promises (to the extent they can be fulfilled).

## COUNT TEN
### (Unjust Enrichment)

138.   Plaintiffs incorporate by reference the allegations above.

139.   Plaintiff  Recovery Housing Academy is pleading this claim for unjust enrichment as an alternative, equitable remedy.

140.   Defendants have been enriched by retaining money paid to them by Plaintiff Recovery Housing Academy but not completing the services they were paid to complete.

141.   There is no justification for the enrichment of Defendants and the corresponding impoverishment of Plaintiff Recovery Housing Academy.

142.   Defendants have been, and will continue to be, unjustly enriched if they are permitted to retain Plaintiff Recovery Housing Academy's money.

143.   If the Court determines Plaintiff has no legal remedy, unjust enrichment relief is appropriate.

**COUNT ELEVEN**
**(Preliminary and Permanent Injunction)**

144.   Plaintiffs incorporate by reference the allegations above.

145.   Defendants have wrongfully and unlawfully made, and continue to make, the false and fraudulent statements contained in paragraphs 67 and 69, above.

146.   Defendants' ongoing wrongful and unlawful conduct, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Plaintiffs by destroying their businesses and reputations.

147.   Plaintiffs have no adequate remedy at law for the injuries threatened/currently suffered as an award of monetary damages would not provide an adequate remedy in light of the potential destruction of Plaintiffs' businesses and reputation.

148.   Accordingly, Plaintiffs seek a preliminary and permanent injunction enjoining Defendants from making and continuing to make the false and fraudulent statements contained in paragraphs 67 and 69, herein (or substantially similar statements).

**COUNT TWELVE**
**(Civil Conspiracy)**

149.   Plaintiffs incorporate by reference the allegations above.

150.   Sherri Candelario and Frank Candelario agreed and thereupon accomplished the underlying torts of intentional interference with contractual relations and prospective contractual relations, defamation, false light, injurious falsehood, and intentional infliction of emotional distress, which they, as co-conspirators, agreed to commit.

151.   As a result thereof, Defendants' actions have caused and continue to cause Plaintiffs to suffer damages.

152.    Defendants' Candelarios' conduct in this case was improper and outrageous, and their actions evidence an evil motive and intent. Defendants' Candelarios' improper conduct was committed for the sole purpose of injuring Plaintiffs and enriching Defendants.

153.    Further, it is in the public interest that punitive damages be awarded in order to send a clear message to Defendants' Candelarios and to others that similar conduct will not be tolerated. Plaintiffs seek punitive damages in a specific amount the Court or trier of fact deems appropriate.

**COUNT THIRTEEN**
**(Aiding and Abetting)**

154.    Plaintiffs incorporate by reference the allegations above.

155.    Sherri Candelario and Frank Candelario committed the torts of intentional interference with contractual relations and prospective contractual relations, defamation, false light, injurious falsehood, and intentional infliction of emotional distress as set forth herein.

156.    Each Candelario knows that the other Candelario's conduct constitutes intentional interference with contractual relations and prospective contractual relations, defamation, false light, injurious falsehood, and intentional infliction of emotional distress and, under Arizona law, such knowledge may be inferred from the circumstances.

157.    Each Candelario substantially assisted or encouraged the other Candelario in the subject misconduct.

158.    Each Candelario is therefore liable for aiding and abetting the other Candelario's torts.

159.    Each Candelario's conduct in this case was improper and outrageous, and their actions evidence an evil motive and intent. Each Candelario's improper conduct was committed for the sole purpose of injuring Plaintiffs and enriching themselves.

160.    Further, it is in the public interest that punitive damages be awarded in order to send a clear message to each Candelario and to others that similar conduct will not be

tolerated.  Plaintiffs seek punitive damages in a specific amount the Court or trier of fact deems appropriate.

## REQUEST FOR RELIEF

Based on the allegations and claims set forth in this Complaint, Plaintiffs respectfully requests judgment against Defendants as follows:

A.     For all damages, including all actual, consequential, incidental, and other damages against Defendants in an amount to be proven at trial;

B.     For injunctive relief against Defendants as set forth and requested in Count Eleven herein;

C.     For a declaratory judgment against Defendants as set forth in Count Eight herein;

D.     For an award of punitive damages in such amounts as may be determined are required to, among other things, punish Defendants and each of them for their intentional, outrageous, and wrongful acts;

E.     For prejudgment and post judgment interest on all damages at the highest rate allowed by law;

F.     For unjust enrichment relief (alternative remedy); and

G.     For an award of attorneys' fees and costs incurred by Plaintiffs pursuant to A.R.S. § 12-341.01; and

H.     For such other and further relief as the Court determines is just and proper under the circumstances of this case.

DATED this 3rd day of December, 2021.

BOURQUE LAW FIRM, P.C.


By:    s/ Arthur J. Bourque
          Arthur J. Bourque
          Attorneys for Plaintiffs

## **VERIFICATION**

I, Isabelle Guarino, declare under penalty of perjury that I have read the Complaint, understand the contents thereof, and state that it is my understanding and good faith belief that the facts and the factual matters contained therein are true and correct to the best of my knowledge, information and belief.

Executed this 3rd day of December, 2021 in Phoenix, Arizona.


_____
_Isabelle Guarino_
ISABELLE GUARINO

# EXHIBIT 1

# INDEPENDENT CONTRACTOR AGREEMENT - Frank and Sherri Candelario

This is a blanket agreement covering the business entities listed below and any future companies that are created, owned or controlled by the Guarino family, including but not limited to: RAL Academy, AL Family, Family Legacy Homes, AL Network, Shared Housing Academy, Pitch Masters Academy, RAL National Convention, RAL Summit, RAL National Association. The companies above are referred to as the "Company"

Name of the Independent Contractor (IC) _Sherri Candelario_

Name of the IC's Company if any _Shared Housing Solutions, LLC_
Primary Mailing Address _24030 SE 258th Ln, Maple Valley, WA 98038_

Email Addresses _sherri.candelario2014@gmail.com_
Telephone Contact Numbers _206-743-5649_

SS# OR EIN if a Business _82-0855605_

PAYMENTS ARE TO BE MADE OUT TO:
_Cardiff Cove Management - Sherri Candelario_

PAYMENTS ARE TO BE MAILED TO:
_24030 SE 258th Ln Maple Valley, WA 98038_

**The purpose of this agreement is to outline the creation, use and sale of a Shared Housing suite of products and offerings.  This will include a Shared Housing Home Study Course,  a 3-Day Shared Housing training, a coaching / support product, a continuation of support and a limited license to use the name "Kate's House Foundation or Kate's House" or any derivative of that name.  Additional products and services may be offered in the future as well.**

Initially, a powerpoint and a webinar will be created and used for promotional purposes by the company with the help and assistance of the IC.

A "Shared Housing Home Study Course" or "SH-HSC" will be created and produced by the Company with the assistance of the IC, using the presentation and information provided by the IC.  The company will own the recording and the product they create based on that content and the IC will be compensated for the use of that information in the following manner:

**1- 10% of the net amount collected by the company for the sale of the SH-HSC will be paid by the company to the IC.  "Net amount" means after any merchant fees and any marketing partner's**

revenue share is deducted.  When the home study course is included as a bonus or as a part of the class, the 10% paid to the IC will apply to the portion designated by the company as the value assigned for the home study course.

2- IC will be paid $5,000 for being the primary instructors and trainers when presenting and teaching at a live 3 day training, in person or online.  Any and all expenses required to present in person or online will be the responsibility of the IC including but not limited to travel and lodging.

3- IC will be paid a 10% commission on the direct sale of a coaching or consulting support product they complete during the Live 3 day training.  A "completed sale" means that during a live 3 day presentation that the IC is the primary presenter, an attendee of that presentation registers for and makes a significant deposit for a support product.  A "significant deposit" will be determined by the company but is generally at least 20% of the total price.   The company will then do their best to collect the balance due and will pay the 10% on the net amount of the amount collected from those sales for up to 30 days after the sale is made.

4- The IC will be responsible to provide the coaching and or consulting (support) that is sold and will be paid 20% of the net amount collected for that support.  That support can be provided by phone, computer or email.  The IC is responsible for any cost incurred or required to provide that support.  IE: phone, internet, staffing if they decide to use other people to provide that support.  If the IC does not provide high quality, timely  support, as determined by the company,  the company reserves the right to use an alternative method or resource to fulfill this support with no compensation being paid to the IC.

5- After the initial support has ended, additional monthly support will be offered to the students for $500 per month.  The IC will receive 80% of the net collected and the company will retain 20%.

6- If a student uses the "Kate's House Foundation" name or a derivative of it, they will be charged $200 a month for the use of the name.  The IC will receive 80% of the net collected for the use of the name and the company will receive 20% of the net collected.

FOR ANY REFUNDS, COMMISSIONS WILL BE CLAWED BACK TO IC AGAINST FUTURE SALES COMMISSIONS.  If there is a refund at any time in the future, any commissions paid to the IC will be charged back to the IC against future commissions to be paid. This is a rare event because we have a policy of selling to those that we feel are the proper candidates for this investment.

As a company,  we would rather not take a sale that we feel has a high probability of refunding later. We never want to  get in the way of someone's personal commitment level BUT we will not take or accept a sale if we feel it is  NOT in the best interest of the student. The company may decide to refund a client well after the expiration date of any refunds. If that happens, the commissions paid on those sales will be deducted

from future sales of the IC on a case by case basis. It's a very rare occurrence but it will help us all in the long run.

**This is not an employee/employer relationship** and the company is not promising any specific work or specific schedule at this time. Any taxes that you may be responsible for as an affiliate/independent contractor will be your sole responsibility and you will hold the company harmless regarding the payment of any taxes that you may be required to pay for the income or benefits that you receive from the company.

The IC may already have consulting arrangements with some people at the time this agreement is signed. The company is not requiring the IC to discontinue those obligations. Any one that the IC is currently consulting needs to be disclosed at this time so they can be "carved out" of the terms of this agreement.

If there is any relationship, plans or potential conflicts that the IC is engaged in or contemplating now, disclose them below or indicate that there are "No relationships or Known Conflicts"

No conflicts
_____
_____
_____
_____

**Nondisclosure Agreement.**

The IC agrees to not discuss what they know or learn about the company, its principles, staff, systems and its operations with anyone outside of the company without prior written approval by the company. Any media inquiries regarding the above named entities must be referred to the company at the time they are made without delay and before they give any comments. The IC may NOT speak on behalf of the company at any time without prior written approval and consent of the company.

The IC agrees that the information the company has revealed and will reveal and expose the IC to is substantial and valuable. The IC understands and agrees that if the IC were to use that information to create a competing company that would cause considerable and irreparable harm to the company. If that were to occur the IC agrees to compensate the company in full for those losses and to cease and desist operations in the future that are found to be in violation of the agreement.

To determine the value and extent of such a loss, The IC and the company agree to be bound by the determination of an Arbitrator. Each party will cover their own expenses in defense or prosecution of any determination of damages. Any party who substantially prevails (giving due consideration to all relevant circumstances and not merely to which party obtains a judgment or recovery in its favor) in asserting or defending a claim arising out of this agreement shall be awarded its costs, fees, and expenses, including reasonable attorney's fees and costs.

**Non Competition Clause.**

The company is in the business of training, coaching and consulting people that want to learn about various topics. The company has spent considerable money and effort to build the company and is endeavouring to protect its interests. The company does not want to compete with the IC in relationship to education, coaching or consulting.

In exchange for the commissions the company will pay to the IC the IC agrees to not compete with the company by offering directly or indirectly, any educational, coaching or consulting offering on the topic of shared housing, senior housing or co-housing or related topics.

This Non compete provision will continue for a period of 2 years after the last payment made by the company to the IC for the use of the information as described in this agreement.

**IC providing education, coaching or consulting outside of this agreement**

The company will be investing considerable time, money and resources to create the product and to promote the offerings that are created. It is important that the IC protect the company when someone attempts to circumvent the company and approaches them directly.

From time to time an individual may approach the IC and ask them if they will provide education, coaching or consulting directly. This would be an attempt to bypass the company. The IC agrees to immediately refer that person directly to the company. The company will endeavour to provide the education, coaching or consulting and then compensate the IC according to the terms of this agreement.

**By signing below you are agreeing to the terms of the agreement above.**

_Sherri Candelario_                    1-7-21

SIGNATURE OF INDEPENDENT CONTRACTOR DATE

                                       2-2-21

SIGNATURE OF THE COMPANY REPRESENTATIVE DATE

**<u>EXHIBIT 2</u>**

# INDEPENDENT CONTRACTOR AGREEMENT - Frank and Sherri Candelario

This is a blanket agreement covering the business entities listed below and any future companies that are created, owned or controlled by the Guarino family, including but not limited to: RAL Academy, AL Family, Family Legacy Homes, AL Network, Shared Housing Academy, Pitch Masters Academy, RAL National Convention, RAL Summit, RAL National Association. The companies above are referred to as the "Company"

Name of the Independent Contractor (IC) _Frank Candelario_

Name of the IC's Company if any _Shared Housing Solutions, LLC_
Primary Mailing Address _24030 SE 258th Ln, Maple Valley, WA 98038_

Email Addresses _Frank.Candelario2014@gmail.com_
Telephone Contact Numbers _760-907-9068_

SS# OR EIN if a Business _82-0855605_

PAYMENTS ARE TO BE MADE OUT TO:
_Cardiff Cove Management - Sherri Candelario_

PAYMENTS ARE TO BE MAILED TO:
_24030 SE 258th Ln, Maple Valley, WA 98038_

The purpose of this agreement is to outline the creation, use and sale of a Shared Housing suite of products and offerings. This will include a Shared Housing Home Study Course, a 3-Day Shared Housing training, a coaching / support product, a continuation of support and a limited license to use the name "Kate's House Foundation or Kate's House" or any derivative of that name. Additional products and services may be offered in the future as well.

Initially, a powerpoint and a webinar will be created and used for promotional purposes by the company with the help and assistance of the IC.

A "Shared Housing Home Study Course" or "SH-HSC" will be created and produced by the Company with the assistance of the IC, using the presentation and information provided by the IC. The company will own the recording and the product they create based on that content and the IC will be compensated for the use of that information in the following manner:

1- 10% of the net amount collected by the company for the sale of the SH-HSC will be paid by the company to the IC. "Net amount" means after any merchant fees and any marketing partner's

revenue share is deducted. When the home study course is included as a bonus or as a part of the class, the 10% paid to the IC will apply to the portion designated by the company as the value assigned for the home study course.

2- IC will be paid $5,000 for being the primary instructors and trainers when presenting and teaching at a live 3 day training, in person or online. Any and all expenses required to present in person or online will be the responsibility of the IC including but not limited to travel and lodging.

3- IC will be paid a 10% commission on the direct sale of a coaching or consulting support product they complete during the Live 3 day training. A "completed sale" means that during a live 3 day presentation that the IC is the primary presenter, an attendee of that presentation registers for and makes a significant deposit for a support product. A "significant deposit" will be determined by the company but is generally at least 20% of the total price. The company will then do their best to collect the balance due and will pay the 10% on the net amount of the amount collected from those sales for up to 30 days after the sale is made.

4- The IC will be responsible to provide the coaching and or consulting (support) that is sold and will be paid 20% of the net amount collected for that support. That support can be provided by phone, computer or email. The IC is responsible for any cost incurred or required to provide that support. IE: phone, internet, staffing if they decide to use other people to provide that support. If the IC does not provide high quality, timely support, as determined by the company, the company reserves the right to use an alternative method or resource to fulfill this support with no compensation being paid to the IC.

5- After the initial support has ended, additional monthly support will be offered to the students for $500 per month. The IC will receive 80% of the net collected and the company will retain 20%.

6- If a student uses the "Kate's House Foundation" name or a derivative of it, they will be charged $200 a month for the use of the name. The IC will receive 80% of the net collected for the use of the name and the company will receive 20% of the net collected.

FOR ANY REFUNDS, COMMISSIONS WILL BE CLAWED BACK TO IC AGAINST FUTURE SALES COMMISSIONS. If there is a refund at any time in the future, any commissions paid to the IC will be charged back to the IC against future commissions to be paid. This is a rare event because we have a policy of selling to those that we feel are the proper candidates for this investment.

As a company, we would rather not take a sale that we feel has a high probability of refunding later. We never want to get in the way of someone's personal commitment level BUT we will not take or accept a sale if we feel it is NOT in the best interest of the student. The company may decide to refund a client well after the expiration date of any refunds. If that happens, the commissions paid on those sales will be deducted

from future sales of the IC on a case by case basis. It's a very rare occurrence but it will help us all in the long run.

**This is not an employee/employer relationship** and the company is not promising any specific work or specific schedule at this time. Any taxes that you may be responsible for as an affiliate/independent contractor will be your sole responsibility and you will hold the company harmless regarding the payment of any taxes that you may be required to pay for the income or benefits that you receive from the company.

The IC may already have consulting arrangements with some people at the time this agreement is signed. The company is not requiring the IC to discontinue those obligations. Any one that the IC is currently consulting needs to be disclosed at this time so they can be "carved out" of the terms of this agreement.

If there is any relationship, plans or potential conflicts that the IC is engaged in or contemplating now, disclose them below or indicate that there are "No relationships or Known Conflicts"

no conflicts
_____
_____
_____
_____

## Nondisclosure Agreement.

The IC agrees to not discuss what they know or learn about the company, its principles, staff, systems and its operations with anyone outside of the company without prior written approval by the company. Any media inquiries regarding the above named entities must be referred to the company at the time they are made without delay and before they give any comments. The IC may NOT speak on behalf of the company at any time without prior written approval and consent of the company.

The IC agrees that the information the company has revealed and will reveal and expose the IC to is substantial and valuable. The IC understands and agrees that if the IC were to use that information to create a competing company that would cause considerable and irreparable harm to the company. If that were to occur the IC agrees to compensate the company in full for those losses and to cease and desist operations in the future that are found to be in violation of the agreement.

To determine the value and extent of such a loss, The IC and the company agree to be bound by the determination of an Arbitrator. Each party will cover their own expenses in defense or prosecution of any determination of damages. Any party who substantially prevails (giving due consideration to all relevant circumstances and not merely to which party obtains a judgment or recovery in its favor) in asserting or defending a claim arising out of this agreement shall be awarded its costs, fees, and expenses, including reasonable attorney's fees and costs.

## Non Competition Clause.

The company is in the business of training, coaching and consulting people that want to learn about various topics. The company has spent considerable money and effort to build the company and is endeavouring to protect its interests. The company does not want to compete with the IC in relationship to education, coaching or consulting.

In exchange for the commissions the company will pay to the IC the IC agrees to not compete with the company by offering directly or indirectly, any educational, coaching or consulting offering on the topic of shared housing, senior housing or co-housing or related topics.

This Non compete provision will continue for a period of 2 years after the last payment made by the company to the IC for the use of the information as described in this agreement.

**IC providing education, coaching or consulting outside of this agreement**

The company will be investing considerable time, money and resources to create the product and to promote the offerings that are created. It is important that the IC protect the company when someone attempts to circumvent the company and approaches them directly.

From time to time an individual may approach the IC and ask them if they will provide education, coaching or consulting directly. This would be an attempt to bypass the company. The IC agrees to immediately refer that person directly to the company. The company will endeavour to provide the education, coaching or consulting and then compensate the IC according to the terms of this agreement.

**By signing below you are agreeing to the terms of the agreement above.**

_Frank Candelario_          1-7-21

SIGNATURE OF INDEPENDENT CONTRACTOR DATE

_____          2-2-21

SIGNATURE OF THE COMPANY REPRESENTATIVE DATE

**EXHIBIT 3**

**Amendment to the Contract-** Candelario/Guarino Agreement Shared Housing Academy
May 12, 2021

Part 4 originally reading:

**4- The IC will be responsible to provide the coaching and or consulting (support) that is sold and will be paid 20% of the net amount collected for that support.** That support can be

provided by phone, computer or email. The IC is responsible for any cost incurred or required to provide that support. IE: phone, internet, staffing if they decide to use other people to provide that support. If the IC does not provide high quality, timely support, as determined by the company, the company reserves the right to use an alternative method or resource to fulfill this support with no compensation being paid to the IC

Will now state:

**4- The IC will be responsible to provide the coaching and or consulting (support) that is sold and will be paid 10% of the net amount collected for that support.** That support can be

provided by phone, computer or email. The IC is responsible for any cost incurred or required to provide that support. IE: phone, internet, staffing if they decide to use other people to provide that support. If the IC does not provide high quality, timely support, as determined by the company, the company reserves the right to use an alternative method or resource to fulfill this support with no compensation being paid to the IC

In addition:

**7- The IC will be compensated 10% of gross initial sales made by the IC at a REIA or other speaking engagement.**

By signing below, all parties agree to the terms outlined in this document.

| | | |
|---|---|---|
| _(signature)_ | Frank Candelario | 5-21-2021 |
| Signature | Printed Name | Date |
| _(signature)_ | Sherri Candelario | 5-21-21 |
| Signature | Printed Name | Date |
| _(signature)_ | EUGENE GUARINO | 5/21/2021 |
| Signature | Printed Name | Date |

Clerk of the Superior Court
*** Electronically Filed ***
A. Marquez, Deputy
12/3/2021 11:57:36 AM
Filing ID 13677280

Person/Attorney Filing: Arthur Bourque
Mailing Address: 1819 E. Morten, Ste. 280
City, State, Zip Code: Phoenix, AZ 85020
Phone Number: (602)559-9550
E-Mail Address: art@bourquelaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 013773, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Recovery Housing Academy, LLC, et al. | |
| Plaintiff(s), | Case No.  **CV2021-054227** |
| v. | |
| Frank Candelario, et al. | **SUMMONS** |
| Defendant(s). | |

To: Frank Candelario

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1.  A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2.  If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 201 W. Jefferson, Phoenix, Arizona 85003 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
    Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
    Note: If you do not file electronically you will not have electronic access to the documents in this case.

3.  If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  MARICOPA

SIGNED AND SEALED this Date: *December 03, 2021*

*JEFF FINE*
Clerk of Superior Court

By: *ARASELI MARQUEZ*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #6329689

Clerk of the Superior Court
*** Electronically Filed ***
A. Marquez, Deputy
12/3/2021 11:57:36 AM
Filing ID 13677282

Person/Attorney Filing: Arthur Bourque
Mailing Address: 1819 E. Morten, Ste. 280
City, State, Zip Code: Phoenix, AZ 85020
Phone Number: (602)559-9550
E-Mail Address: art@bourquelaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 013773, Issuing State: AZ

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Recovery Housing Academy, LLC, et al. Plaintiff(s), v. Frank Candelario, et al. Defendant(s). | Case No.  **CV2021-054227** <br><br> **SUMMONS** |

To: Shared Housing Solutions, LLC

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 201 W. Jefferson, Phoenix, Arizona 85003 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
Note: If you do not file electronically you will not have electronic access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

AZturboCourt.gov Form Set #6329989

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  MARICOPA

SIGNED AND SEALED this Date: *December 03, 2021*

*JEFF FINE*
Clerk of Superior Court

By: *ARASELI MARQUEZ*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #6329689

2

Clerk of the Superior Court
*** Electronically Filed ***
A. Marquez, Deputy
12/3/2021 11:57:36 AM
Filing ID 13677281

Person/Attorney Filing: Arthur Bourque
Mailing Address: 1819 E. Morten, Ste. 280
City, State, Zip Code: Phoenix, AZ 85020
Phone Number: (602)559-9550
E-Mail Address: art@bourquelaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 013773, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Recovery Housing Academy, LLC, et al. | |
| Plaintiff(s), | Case No.  **CV2021-054227** |
| v. | |
| Frank Candelario, et al. | **SUMMONS** |
| Defendant(s). | |

To: Sherri Candelario

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT
AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO
NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 201 W. Jefferson, Phoenix, Arizona 85003 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
   Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
   Note: If you do not file electronically you will not have electronic access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  MARICOPA

SIGNED AND SEALED this Date: *December 03, 2021*

*JEFF FINE*
Clerk of Superior Court

By: *ARASELI MARQUEZ*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #6329689

2

Clerk of the Superior Court
*** Electronically Filed ***
A. Marquez, Deputy
12/3/2021 11:57:36 AM
Filing ID 13677278

BOURQUE LAW FIRM, P.C.
Arthur J. Bourque (No. 013773)
1819 East Morten, Suite 280
Phoenix, Arizona  85020
Telephone: (602) 559-9550
art@bourquelaw.com

Attorneys for Plaintiffs

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| RECOVERY HOUSING ACADEMY, LLC, an Arizona limited liability company; RAL ACADEMY, LLC, an Arizona limited liability company; MONA GUARINO; and ISABELLE GUARINO, <br><br> Plaintiffs, <br><br> v. <br><br> FRANK CANDELARIO and SHERRI CANDELARIO, husband and wife; SHARED HOUSING SOLUTIONS, LLC, <br><br> Defendants. | Case No. __**CV2021-054227**__ <br><br> **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Pursuant to Rule 65, *Arizona Rules of Civil Procedure*, and A.R.S. § 12-1801, Plaintiffs request entry of a Temporary Restraining Order and a Preliminary Injunction enjoining Defendants from continuing to publish the following false and defamatory statements to the public, which are causing Plaintiffs to suffer irreparable harm:

1. That Plaintiffs terminated Defendants regarding their Independent Contractor Agreement (the "Agreement").

2. That Plaintiffs "asked [Defendants] to terminate our consulting agreement with [Plaintiffs] last week. We did not quit. We were fired."

3. That Defendants "believe [the alleged termination] is due to a restructuring that was required by [Plaintiffs] following Gene [Guarino's] passing."

4. That Defendants "have no information as to why it [termination] happened."

5. That Defendants "we have no knowledge as to why they are making business decisions that affect our ability to fulfill our commitments."

6. Defendants "have no visibility into [Plaintiffs'] business, probate issues or even if this is due to grief over the loss of their parent. We too, were blindsided."

(Defendants' statements are hereinafter referred to as the "False Statements.")

Defendants are making the False Statements to exploit and profit off the death of Gene Guarino, who passed away from Covid-19 complications on October 13, 2021, leaving his wife, Plaintiff Mona Guarino and children, including Isabelle Guarino, to operate Plaintiffs Recovery Housing Academy, LLC ("Recovery Housing Academy") and RAL Academy, LLC ("RAL Academy").  By making the False Statements, Defendants have caused and continue to cause, among other things, (1) numerous Plaintiffs' customers to terminate their contracts with Plaintiffs and sever their relationships; (2) Plaintiffs' three independent contractors that provide support to terminate their contracts with Plaintiffs and sever their relationships; (3) industry organizations to question Plaintiffs' integrity, viability, business ethics, and professionalism; and (4) damage to Plaintiffs' reputations.

Defendants are motivated by greed in making the False Statements.  Defendants desire to destroy Gene Guarino's widow's and children's family business and steal away their customers, independent contractors, and industry contacts.  In each email where the False Statements are made, Defendants solicit the recipient for their business.  If Defendants are not stopped from making the False Statements, they will succeed in irreparably destroying Plaintiffs' businesses and reputations in a way that cannot be adequately remedied by money damages.

## MEMORANDUM OF POINTS AND AUTHORITIES

I. **FACTS SUPPORTING ENTRY OF A TRO/PRELIMINARY INJUNCTION.**

   A. **The Parties.**

Plaintiffs Recovery Housing Academy and RAL Academy are Arizona companies owned and operated by Mona Guarino and her adult children, including Isabelle Guarino

(Exhibit 1, Declaration of Isabelle Guarino).  Recovery Housing Academy teaches people how to invest in single family real estate by owning and operating clean and sober living homes. RAL Academy teaches people how to own and operate single family homes as Residential Assisted Living for seniors. (*Id*.)

Mona's husband, Gene, was the founder and Manager of each business until he passed away from Covid-19 complications on October 13, 2021. (*Id*.)

Defendants are husband and wife, Frank and Sherri Candelario (the "Candelarios"), and their company, Shared Housing Solutions, LLC. (*Id*.)

**B.**      **The Independent Contractor Agreement.**

In February 2021, Recovery Housing Academy and RAL Academy entered into an Independent Contractor Agreement (the "Agreement") with Defendants (Exhibits 2 and 3 are copies of the countersigned Agreement).  (*Id*.)

The Agreement identifies the Candelarios and their company as independent contractors for Recovery Housing Academy and RAL Academy (and other Guarino family entities not at issue here). (*Id*.) The Agreement states:

> The purpose of this agreement is to outline the creation, use and sale of a Shared Housing suite of products and offerings.  This will include a Shared Housing Home Study Course, a 3-Day Shared Housing training, a coaching / support product, a continuation of support and a limited license to use the name "Kate's House Foundation or Kate's House" or any derivative of that name.  Additional products and services may be offered in the future as well. (*Id*.)

In February 2021, after execution of the Agreement, the Candelarios traveled to Arizona (Exhibit 1, Declaration of Isabelle Guarino). The main purpose of the Candelarios' trip to Arizona was to meet with Gene Guarino and present the live three-day training course referenced in the Agreement. (*Id*.)

Prior to the presentation of the live three-day training course, the Candelarios and Gene Guarino collaborated to create the PowerPoint presentation and other content to be used at the live three-day training course. (*Id*.) Plaintiffs Recovery Housing Academy's and RAL Academy's business studio, equipment, and employees and agents in Gilbert, Arizona

were used to create and record the live three-day training course. (*Id*.)

Plaintiff Recovery Housing Academy paid the Candelarios $5,000 to present the live three-day training course. (*Id*.)  Plaintiff Recovery Housing Academy paid the Candelarios additional compensation for the live three-day training course in the form of (1) commissions on revenue received from Plaintiff's products purchased by training course attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiff.  (*Id*.)

In May, July, and August, 2021, the Candelarios made additional business trips to Arizona, and repeated the independent contractor services for Plaintiffs under the Agreement, including providing services in presenting the live three-day training course for Plaintiffs, and using Plaintiffs' studio, equipment, employees, and agents. (*Id*.)  Defendants were compensated each time -- $5,000 to present each live three-day training course, and additional compensation for the live three-day training course in the form of (1) commissions on revenue received from Plaintiffs' products purchased by training course attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiffs. (*Id*.)

## C.   <u>Gene Guarino Dies and Defendants Exploit His Death for Profit by Making the False Statements and Engaging in Other Misconduct</u>.

On October 13, 2021, Gene Guarino died from Covid 19 complications. (*Id*.) Despite knowing that Mona, Isabelle, and the rest of the family were grieving the loss of their husband and father, the Candelarios began a campaign to destroy Plaintiffs' businesses and profit off that destruction. (*Id*.) Among other things:

- On November 11, 2021, despite having been already paid to perform coaching and consulting for Plaintiffs' customers under the Agreement, the Candelorio Defendants unilaterally refused to perform the work they had contracted to perform and been paid for.  (*Id*.)

- On November 11, 2021, Sherri Candelario advised Mona and Isabelle on a recorded call that the Agreement "didn't work" for the Candelarios and

"we're just not doing it anymore." (Exhibit 4 is the recording) (*Id.*).   This led Plaintiffs' customers to demand refunds from Plaintiffs for monies paid to Plaintiffs for coaching and consulting. (*Id.*).

- On November 19, 2021, Defendants' lawyers sent a "Termination Letter" to Plaintiffs, falsely claiming that Plaintiffs initiated the termination of the Agreement (it is likely the Candelarios were not truthful with their counsel, who would not have made such an allegation had they known the truth) (Exhibit 5) (*Id.*).

- On November 23, 2021, Defendant Sherri Candelario sent separate emails, one to a Plaintiff customer and the other to an industry leader, in which she made the False Statements and solicited the customer's and industry leader's business – callously attempting to exploit Gene Guarino's death by spreading lies that Gene's family terminated Defendants, lacked integrity, did not care about customers, were untrustworthy and in disarray, and were and possibly not even viable as a business anymore (Exhibits 6 and 7).

- The False Statements have wrought immediate, damaging financial and reputational impacts on Plaintiffs.   Nine Recovery Housing Academy customers thus far have demanded refunds totaling more than $182,139 following the Candelerios terminating the Independent Contractor Agreement, failing to provide coaching and consulting that Recovery Housing Academy has paid them to perform, and following the Candelerios publishing the False Statements (Exhibit 1, Declaration of Isabelle Guarino).

- The following independent contractors who provide or intended to provide coaching and consulting services have severed ties with Plaintiff Recovery Housing Academy: Dave Schlosser, TracieAnn Dalberiste, and Stefanie Womble (*Id.*).

- Based on customers' demands for refunds and Plaintiffs' other independent contractors severing their relationships with Plaintiffs, it is clear that

Defendants are making the False Statements to a *numerous* customers, independent contractors, and industry professionals -- all in an effort to destroy Plaintiffs' business and reputations so that Defendants can harm Plaintiffs and enrich themselves (*Id.*).

## II.   APPLICABLE LEGAL STANDARD.

To obtain a preliminary injunction Plaintiffs must establish (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury not remediable by damages if the requested relief is not granted; (3) a balance of hardships favoring that party, and (4) public policy favoring a grant of the injunction. *Shoen v. Shoen*, 167 Ariz. 58, 63, 804 P.2d 787, 792 (App. 1990).

The court may use a sliding scale approach when evaluating this standard. *Ariz. Ass'n of Providers for Persons with Disabilities v. State*, 223 Ariz. 6, 12, 219 P.2d 216, 222 (App. 2009). The court may grant the request for injunction if Plaintiffs prove either: (1) probable success on the merits and the possibility of irreparable injury or (2) the presence of serious questions on the merits and that the balance of hardships tips sharply in the movant's favor. *Id*.

The standard for issuing a TRO is the same as that for issuing a preliminary injunction. *Gonzalez v. State*, 435 F. Supp. 2d 997, 999 (D. Ariz. 2006).

## III.   ARGUMENT

### A.   Plaintiffs Have a Strong Likelihood of Success on the Merits.

Plaintiffs have a strong likelihood of success on the merits that the False Statements constitute (1) intentional interference with contract and prospective contractual relations; (2) defamation; (3) false light; (4) injurious falsehood; (5) intentional infliction of emotional distress; and (6) breach of the implied covenant of good faith and fair dealing.

Because each claim represents an independent basis to satisfy this first prerequisite for injunctive relief, Plaintiffs need only prove a likelihood of success on the merits for one claim. Further, "[the] party requesting a preliminary injunction assumes a lesser burden of proof of probable success on the merits than does a party moving for summary judgment,

who must establish entitlement to final judgment on the merits." *Powell-Cerkoney,* 176 Ariz. at 280, 860 P.2d at 1333, citing *United States v. Local 560 (J.B. T),* 974 F.2d 315, 330 (3rd. Cir. 1992).

1.     **Intentional Interference with Contract and Prospective Contractual Relations.**

To establish a *prima facie* case of intentional interference with contract/business relationships, Plaintiffs must show (1) the existence of a valid contractual relationship or business expectancy, (2) the interferer's knowledge of the relationship or expectancy, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Hill v. Peterson,* 201 Ariz. 363,366, 35 P.3d 417,420 (App. 2001). The elements of interference with a prospective business relationship are identical, except instead of showing the existence of a valid contractual relationship, the plaintiff need only show the existence of a valid actual or *prospective* business relationship. *Id.*

Each of the foregoing elements are present here:  Plaintiff Recovery Housing Academy has a valid contractual relationship or business expectancy with its customers, independent contractor support providers, and industry organizations; Defendants know of Plaintiff Recovery Housing Academy's contractual relationship or business expectancy with customers, independent contractor support providers, and industry organizations; Defendants' intentional interference has induced or caused a breach or termination of Plaintiff Recovery Housing Academy's contractual relationship or business expectancy with numerous customers, three independent contractor support providers, and industry organizations (Exhibit 1, Declaration of Isabelle Guarino); Plaintiff Recovery Housing Academy has suffered resultant damages (*Id.*); and Defendants' interference was and is improper as to motive or means:  the False Statements are abject lies -- disproven by Sherri Candelario's very own recorded words. (Exhibit 4).

Thus, Plaintiffs have a strong likelihood of success on the merits on their claim for intentional interference with contract and prospective contractual relations.

### 2.     **Defamation**.

A publication is defamatory when it brings the defamed person into disrepute, contempt, or ridicule, or impeaches a plaintiff's honesty, integrity, virtue, or reputation. *Dube v. Likins*, 216 Ariz. 406, 418-19, 167 P.3d 93, 105-06 (App. 2007), citing *Turner v. Devlin*, 174 Ariz. 201, 203–04, 848 P.2d 286, 288–89 (1993).

A person may be liable for what he insinuates as well as for what he says explicitly. *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 588, 447 P.2d 840, 846 (1968).  It is not necessary that the publication, to be actionable, should make a charge in direct or express terms.    *Arizona Pub. Co. v. Harris*, 20 Ariz. 446, 451-52, 181 P. 373, 375 (1919). "To maintain an action for libel or slander it is not necessary that the charge should be direct and positive; the imputation may be inferred from an indirect communication, as where defendant 'expresses a suspicion, or institutes a comparison, or delivers the words as matter of hearsay or answer, or exclamation, or uses disjunctive or adjective words, or speaks ironically.'  Insinuations may be as defamatory as direct assertions, since the effect and tendency of the language used, and not the form, is the criterion." *Id.*

A publication is defamatory per se if it is "a communication of such nature that the court can presume as a matter of law that the communication will tend to degrade or disgrace the party defamed." *McClinton v. Rice*, 76 Ariz. 558, 265 P.2d 425 (1953).  Included among those communications considered to be defamatory per se are those utterances that "tend[] to injure a person in his profession, trade, or business." *Modla v. Parker*, 17 Ariz. App. 54, 495 P.2d 494 (1972).

The False Statements, expressly and by insinuation, bring Plaintiffs into disrepute, contempt, or ridicule, and impeach their honesty, integrity, virtue, and reputation.  *Dube*, 216 Ariz. at 418-19.  See also *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 588 (a person may be liable for what he insinuates as well as for what he says explicitly); 20 Ariz. 446, 451-52, 181 P. 373, 375 (1919) (it is not necessary that the publication, to be actionable, should make a charge in direct or express terms).

Thus, Plaintiffs have a strong likelihood of success on the merits on their claim for

defamation.

### 3.   **False Light**.

False light invasion of privacy is recognized as a tort cause of action in Arizona separate and apart from defamation.  *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 340, 783 P.2d 781, 786 (1989).  A false light tort occurs where:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.  *Id.*, 162 Ariz. At 338, 783 P.2d at 784 (quoting *Restatement* § 652E).

In a false light privacy action, as in a defamation action, a court should not consider words or elements in isolation but should view them in the context of the whole article to determine if they constitute an invasion of privacy.  Cf. *Chauffeurs, Teamsters and Helpers Local Union No. 795 v. Kansans for the Right to Work*, 189 Kan. 115, 368 P.2d 308, 315 (1962) (defamation); *Little v. Allen*, 149 Kan. 414, 8 P.2d 510, 511 (1939) (defamation).

A false light claim is established if the defendant knowingly or recklessly published false information or innuendo about the plaintiff that a reasonable person would find highly offensive.  Id. at 340, 783 P.2d at 786.  (emphasis added).  Moreover:

> …[A] plaintiff may recover even in the absence of reputational damage, as long as the publicity is unreasonably offensive and attributes false characteristics.  However, to qualify as a false light invasion of privacy, the publication must involve "a major representation of [the plaintiff's] character, history, activities or beliefs," not merely minor or unimportant inaccuracies.  *Godbehere*, 162 Ariz. At 341, 783 P.2d at 787 (citing Restatement § 652E comment c.).  *Id.*

The False Statements (1) are unreasonably offensive and attribute false characteristics to Plaintiffs and (2) constitute "a major representation of [Plaintiffs'] character, history, activities or beliefs."  Therefore, Plaintiffs have a strong likelihood of success on the merits on their claim for false light.

1

**4.**      **Injurious Falsehood.**

2      Arizona permits an action for injurious falsehood based on a derogatory statement

3 regarding "the plaintiff's business." *Aldabbagh v. Ariz. Dept. of Liquor Licenses & Control*,

4 162 Ariz. 415, 421, 783 P.2d 1207, 1213 (App. 1989).

5      To establish a valid cause of action for "injurious falsehood," plaintiffs must allege

6 that the defendant made a statement or statements:

7      1.      To a third party, i.e., "published;"

8      2.      Knowing that the statement or statements were false;

9      3.      In an effort to persuade the third party from dealing with the plaintiff; and

10      4.      That resulted in a pecuniary loss to the plaintiff.

11      See, e.g., *W. Techs., Inc. v. Sverdrup & Parcel, Inc*., 154 Ariz. 1, 4, 739 P.2d 1318,

12 1321 (App. 1986) (citing W. Prosser and W. Keeton, *The Law of Torts* § 128, at 963 (5th

13 ed. 1984), and *Restatement* § 623A).

14      The False Statements are regarding Plaintiffs' business, are known to be false, are

15 being published in an effort to persuade third parties from dealing with Plaintiffs, and have

16 caused Plaintiffs pecuniary loss through customer cancellations and refund demands as well

17 as loss of contractor services that must be replaced through extra efforts and at higher cost.

18 They will continue to cause even more harm -- industry-wide -- so as long as they are still

19 being made. Therefore, Plaintiffs have a strong likelihood of success on the merits on their

20 claim for injurious falsehood.

21      **5.**      **Intentional Infliction of Emotional Distress**.

22      The Arizona Supreme Court has set out three elements for the tort of intentional

23 infliction of emotional distress, based upon the Restatement of Torts. *Ford v. Revlon, Inc*.,

24 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987) (citing *Savage v. Boies*, 77 Ariz. 355, 272 P.2d

25 349 (1954)). The three elements are: "the conduct by the defendant must be 'extreme' and

26 'outrageous'"; "the defendant must either intend to cause emotional distress or recklessly

27 disregard the near certainty that such distress will result from his conduct"; and, "severe

28

emotional distress must indeed occur as a result of defendant's conduct." *Id.* (citations omitted).

The False Statements are extreme and outrageous because they seek to exploit, through lies and for profit, Mona's husband's and Isabelle's father's death – even implicating Gene's death as the reason Plaintiffs cannot be trusted. Made just weeks after Gene's death, the False Statements were intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from Defendants' conduct; and, Mona and Isabelle have suffered emotional distress because of Defendants' conduct. Thus, Plaintiffs have a strong likelihood of success on the merits on their intentional infliction of emotional distress claim.

**6.      Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Implied in every contract is a covenant of good faith and fair dealing that neither party to the contract will engage in any unfair dealing that frustrates the purpose of the contract or otherwise disappoints the reasonable expectations of the other contracting party. *Rawlings v. Apodaca*, 151 Ariz. 149, 153-54, 726 P.2d 565, 569-70 (1986).

The Defendants' independent contractor Agreement makes clear that the many benefits of the contracts expected by Plaintiffs was the ongoing operation of a business of great value to their customer base because it offered not only formalized instruction in how to break into the addiction treatment facility business, but long-term consulting and management help and insights for those customers who were or became operators of such facilities. Plaintiffs' bargain anticipated long-term customer relationships by customers who were confident in the business's expertise, stability, ability to immediately deliver well-crafted content and instruction, along with the ability to deliver one-on-one instruction from experienced and reliable independent contractor consultants.   All of these benefits required customers and independent contractors used by the company to trust that the company could deliver the services promised, that working with the company would be efficient and services would be delivered through a consistent set of prompt and responsive contractor consultants that the customers could count on for long-term help. Defendants' False Statements destroy

each of these contractual benefits and breach the implied covenant of good faith and faith dealing.

### B.    Plaintiffs Will Suffer Irreparable Harm If a TRO is Not Granted.

Where there is a substantial likelihood that a plaintiff will succeed on the merits of its claims, it is presumed that the plaintiff will suffer irreparable and immediate harm if not granted a preliminary injunction. *See Tracer Research Corp. v. Nat'l Ent. Serv.* Co., 843 F. Supp. 568, 582 (D. Ariz. 1993). It is therefore Defendants' burden to prove that Plaintiffs would not suffer irreparable harm absent injunctive relief.

There is clear proof that Plaintiffs will suffer irreparable harm that cannot be remedied by money damages, absent injunctive relief.  By making the False Statements Defendants are irreparably harming Plaintiffs' businesses and reputations as described above. *See e.g., Rent-A-Center, Inc. v. Canyon Television & Appliance Rental,* 944 F.2d 597,603 (9th Cir. 1991); *Brennan Petroleum Prods. Co. v. Pasco Petroleum Co.,* 373 F. Supp. 1312, 1316 (D. Ariz. 1974) (when "the complained-of action results not only in a contemporaneous loss of profits but in loss of goodwill or the ability to compete as effectively in the marketplace, the relief should be granted."). Moreover, "once a protectable interest is established, irreparable injury is presumed to follow if the interest is not protected." *Phoenix Orthopaedic Surgeons, Ltd. v. Peairs,* 164 Ariz. 54, 59, 790 P.2d 752, 757 (App. 1989), *disapproved on other grounds by Valley Medical Specialists v. Farber,* 194 Ariz. 363, 982 P.2d 1277 (1999).

Given the evidence of real irreparable injury and the presumptions of such injuries triggered by the evidence presented here, the Court has ample evidence that irreparable harm will continue absent an injunction against further False Statements.

### C.    The Balancing of Hardships Favors Plaintiffs.

The balancing of hardships is established when a party shows probable success on the merits and the possibility of irreparable injury.  *Power P.E.O., Inc. v. Employees Ins. of Wausau,* 201 Ariz. 559, 562, 38 P.3d 1224, 1227 (App. 2002); *see also Guarino, supra* (moving party may establish either (1) probable success on the merits and the possibility of

irreparable injury, or (2) the presence of serious questions and that "the balance of hardships tip[s] sharply" in favor of the moving party).

Here, Defendants will suffer no hardship if they are enjoined from making the False Statements, whereas Plaintiffs are suffering great and irreparable harm because of the False Statements.   Plaintiffs are suffering 100% of the hardship from Defendants' False Statements.

**D.    Granting Injunctive Relief Will Advance the Public Interest.**

Granting injunctive relief will benefit the public interest by stopping Defendants from making False Statements that will disrupt customers and independent contractors from providing treatment and assisted care facility services and coaching and consulting services to enable providers to operate treatment and assisted care facilities to people in need.

Granting injunctive relief will further benefit the public interest, which is served by protecting a company's business operations and contractual rights. *Compass Bank* v. *Hartley,* 430 F.Supp.2d 973, 983 (D. Ariz. 2006), *citing Merrill Lynch, Pierce, Fenner & Guarino, Inc.* v. *McClafferty,* 287 F. Supp. 2d at 1249.  The very reason our common law has long recognized a variety of claims for injury to reputation is because our public policy recognizes the massive interest each person or entity has in their reputation for integrity, reliability, competence, and other desirable traits, and how devastating and lasting false disparagement is to such critical assets and how dramatically reputational loss can harm customer relationships and income over long periods of time.

Thus, the public interest factor favors Plaintiffs, because the granting of injunctive relief is essential to protect their interests in, among other things, their customers, independent contractors, and industry organizations.

**V.    CONCLUSION.**

For the foregoing reasons, Plaintiffs respectfully request that the Court to grant this

- 13 -

1   Application and enter the proposed Order that is filed herewith to that Defendants are

2   prohibited and enjoined from making the False Statements.

3        DATED this 3rd day of December, 2021.

4                                              BOURQUE LAW FIRM, P.C.

5

6

7                               By:   s/ Arthur J. Bourque
                                      Arthur J. Bourque
8                                     Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## DECLARATION OF ISABELLE GUARINO

Isabelle Guarino declares and states:

1. I am a plaintiff in this matter and a representative of Recovery Housing Academy and RAL Academy.

2. Plaintiffs Recovery Housing Academy and RAL Academy are Arizona companies owned and operated by my mother, Mona Guarino, and my siblings (Victoria and Emmanuel) and me.

3. Recovery Housing Academy teaches people how to invest in single family real estate by owning and operating clean and sober living homes.

4. RAL Academy teaches people how to own and operate single family homes as Residential Assisted Living for seniors.

5. My father, Eugene (Gene) Guarino, was the founder and Manager of each business until he passed away from Covid-19 complications on October 13, 2021.

6. Defendants are husband and wife, Frank and Sherri Candelario (the "Candelarios"), and their company, Shared Housing Solutions, LLC.

7. In February 2021, Recovery Housing Academy and RAL Academy entered into two Independent Contractor Agreements (the "Agreements") with Defendants. The Agreements are substantially identical, except Frank Candelario signed one Agreement and Sherri Candelario the other.

8. In February 2021, after execution of the Agreements, the Candelarios traveled to Arizona. The main purpose of the Candelarios' trip to Arizona was to meet

with my father and present the live three-day training course referenced in the Agreements.

9.      Prior to the presentation of the live three-day training course, the Candelarios and Gene Guarino collaborated to create the PowerPoint presentation and other content to be used at the live three-day training course.

10.      Plaintiffs Recovery Housing Academy's and RAL Academy's business studio, equipment, and employees and agents in Gilbert, Arizona were used to create and record the live three-day training course.

11.      Plaintiff Recovery Housing Academy paid the Candelarios $5,000 to present the live three-day training course.

12.      Plaintiff Recovery Housing Academy paid the Candelarios additional compensation for the live three-day training course in the form of (1) commissions on revenue received from Plaintiff's products purchased by training course attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiff.

13.      In May, July, and August, 2021, the Candelarios made additional business trips to Arizona, and repeated the independent contractor services for Plaintiffs under the Agreements, including providing services in presenting the live three-day training course for Plaintiffs, and using Plaintiffs' studio, equipment, employees, and agents.  Defendants were compensated each time -- $5,000 to present each live three-day training course, and additional compensation for the live three-day training course in the form of (1) commissions on revenue received from Plaintiffs' products purchased by training course

attendees and (2) a percentage of revenue received for the Candelarios' coaching and consulting sold by Plaintiffs.

14.     On October 13, 2021, my father died from Covid 19 complications. Despite knowing that my mother, me, and the rest of our family were grieving our loss, the Candelarios began a campaign to destroy our businesses and profit off that destruction. Among other things:

- On November 11, 2021, despite having been already paid to perform coaching and consulting for Plaintiff Recovery Housing Academy's customers under the Agreements, Defendants unilaterally refused to perform the work they had contracted to perform and been paid for.

- On November 11, 2021, Sherri Candelario advised my mother and me on a recorded call that the Agreements "didn't work" for the Candelarios and "we're just not doing it anymore."

- On November 19, 2021, Defendants' lawyers sent a "Termination Letter" to us, falsely claiming that Plaintiffs initiated the termination of the Agreements.

- On November 23, 2021, Defendant Sherri Candelario sent emails to a Recovery Housing Academy customer (Frank Harris) and an industry leader (Anera Snell) in which she made the False Statements and solicited their business – attempting to exploit my father's death by spreading falsehoods that our family terminated Defendants, lacked integrity, did not

care about customers, and that we were untrustworthy and in disarray, and were and possibly not even viable as a business anymore.

15.     The False Statements (as defined in the Application) have caused immediate, damaging financial and reputational impacts on our businesses and us.  Nine Recovery Housing Academy customers thus far have demanded refunds totaling more than $182,139 following the Candelerios terminating the Independent Contractor Agreements, failing to provide coaching and consulting that Recovery Housing Academy has paid them to perform, and following the Candelerios publishing the False Statements.

16.     Contrary to the False Statements:

•     Plaintiffs did not terminate the Independent Contractor Agreements, Defendants did, as stated by Sherri Candelario on November 11, 2021.

•     There was no "restructuring that was required by [Plaintiffs] following [my father's] passing."

•     Plaintiffs did not "mak[e] business decisions that affect[ed] [Defendants] ability to fulfill [their] commitments."

•     Instead of Plaintiffs terminating Defendants, in truth Defendant Sherri Candelario claimed that the Agreements "didn't work" for the Candelarios and "we're just not doing it anymore."

•     The following Sherri Candelario statement is patently false: "RAL asked Frank and I to terminate our consulting agreement with RAL last week. We did not quit. We were fired."

- The Candelarios were never "blindsided" by Plaintiffs and never believed that their (fake) termination was "due to grief over the loss of [our] parent."

- I did not "request [Defendants] terminate [the Agreements].

- There was not "a lot going on in [our] family and the business after the death of [our] dad" other than grieving, which never affected the Agreements with Defendants.

- We did not "need to cut ties" with Defendants; we did not "cut ties."

17. The following independent contractors who provide or intended to provide coaching and consulting services have severed ties with Plaintiff Recovery Housing Academy because of Defendants:  Dave Schlosser, TracieAnn Dalberiste, and Stefanie Womble.

18. Based on customers' demands for refunds and Plaintiffs' other independent contractors severing their relationships with Plaintiffs, it is clear that Defendants are making the False Statements to numerous customers, independent contractors, and industry professionals -- all in an effort to destroy our business and reputations so that Defendants can harm us and profit themselves.

19. Anera Snell, to whom Sherri Candelario emailed a portion of the False Statements, is a representative of Ohio Real Estate Investment Association ("OREIA"). OREIA is an industry organization that Recovery Housing Academy depends on for presentations which lead to customers.

20.     Frank Harris, to whom Defendant Sherri Candelario emailed a portion of the False Statements, was a customer of Recovery Housing Academy; he purchased the 3-day training, which had to be refunded when Defendants breached their agreement and promise to conduct the training, instead lying to Mr. Harris that Plaintiffs had terminated Defendants.

21.     I believe that if Defendants are not enjoined from making the False statements our (Plaintiffs') businesses and reputations will be irreparably harmed.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 3rd day of December, 2021.


_Isabelle Guarino_
ISABELLE GUARINO

## EXHIBIT 2

# INDEPENDENT CONTRACTOR AGREEMENT - Frank and Sherri Candelario

This is a blanket agreement covering the business entities listed below and any future companies that are created, owned or controlled by the Guarino family, including but not limited to: RAL Academy, AL Family, Family Legacy Homes, AL Network, Shared Housing Academy, Pitch Masters Academy, RAL National Convention, RAL Summit, RAL National Association. The companies above are referred to as the "Company"

Name of the Independent Contractor (IC) _Frank Candelario_

Name of the IC's Company if any _Shared Housing Solutions, LLC_
Primary Mailing Address _24030 SE 258th Ln, Maple Valley, WA 98038_

Email Addresses _Frank.Candelario 2014 @ gmail.com_
Telephone Contact Numbers _760-907-9068_

SS# OR EIN if a Business _82-0855605_

PAYMENTS ARE TO BE MADE OUT TO:
_Cardiff Cove Management - Sherri Candelario_

PAYMENTS ARE TO BE MAILED TO:
_24030 SE 258th Ln, Maple Valley, WA 98038_

**The purpose of this agreement is to outline the creation, use and sale of a Shared Housing suite of products and offerings. This will include a Shared Housing Home Study Course, a 3-Day Shared Housing training, a coaching / support product, a continuation of support and a limited license to use the name "Kate's House Foundation or Kate's House" or any derivative of that name. Additional products and services may be offered in the future as well.**

Initially, a powerpoint and a webinar will be created and used for promotional purposes by the company with the help and assistance of the IC.

A "Shared Housing Home Study Course" or "SH-HSC" will be created and produced by the Company with the assistance of the IC, using the presentation and information provided by the IC. The company will own the recording and the product they create based on that content and the IC will be compensated for the use of that information in the following manner:

**1- 10% of the net amount collected by the company for the sale of the SH-HSC will be paid by the company to the IC. "Net amount" means after any merchant fees and any marketing partner's**

revenue share is deducted.  When the home study course is included as a bonus or as a part of the class, the 10% paid to the IC will apply to the portion designated by the company as the value assigned for the home study course.

2- IC will be paid $5,000 for being the primary instructors and trainers when presenting and teaching at a live 3 day training, in person or online.  Any and all expenses required to present in person or online will be the responsibility of the IC including but not limited to travel and lodging.

3- IC will be paid a 10% commission on the direct sale of a coaching or consulting support product they complete during the Live 3 day training.  A "completed sale" means that during a live 3 day presentation that the IC is the primary presenter, an attendee of that presentation registers for and makes a significant deposit for a support product.  A "significant deposit" will be determined by the company but is generally at least 20% of the total price.   The company will then do their best to collect the balance due and will pay the 10% on the net amount of the amount collected from those sales for up to 30 days after the sale is made.

4- The IC will be responsible to provide the coaching and or consulting (support) that is sold and will be paid 20% of the net amount collected for that support.  That support can be provided by phone, computer or email.  The IC is responsible for any cost incurred or required to provide that support.  IE: phone, internet, staffing if they decide to use other people to provide that support.  If the IC does not provide high quality, timely  support, as determined by the company,  the company reserves the right to use an alternative method or resource to fulfill this support with no compensation being paid to the IC.

5- After the initial support has ended, additional monthly support will be offered to the students for $500 per month.  The IC will receive 80% of the net collected and the company will retain 20%.

6- If a student uses the "Kate's House Foundation" name or a derivative of it, they will be charged $200 a month for the use of the name.  The IC will receive 80% of the net collected for the use of the name and the company will receive 20% of the net collected.

FOR ANY REFUNDS, COMMISSIONS WILL BE CLAWED BACK TO IC AGAINST FUTURE SALES COMMISSIONS.  If there is a refund at any time in the future, any commissions paid to the IC will be charged back to the IC against future commissions to be paid. This is a rare event because we have a policy of selling to those that we feel are the proper candidates for this investment.

As a company,  we would rather not take a sale that we feel has a high probability of refunding later. We never want to  get in the way of someone's personal commitment level BUT we will not take or accept a sale if we feel it is  NOT in the best interest of the student. The company may decide to refund a client well after the expiration date of any refunds. If that happens, the commissions paid on those sales will be deducted

from future sales of the IC on a case by case basis. It's a very rare occurrence but it will help us all in the long run.

**This is not an employee/employer relationship** and the company is not promising any specific work or specific schedule at this time. Any taxes that you may be responsible for as an affiliate/independent contractor will be your sole responsibility and you will hold the company harmless regarding the payment of any taxes that you may be required to pay for the income or benefits that you receive from the company.

The IC may already have consulting arrangements with some people at the time this agreement is signed. The company is not requiring the IC to discontinue those obligations. Any one that the IC is currently consulting needs to be disclosed at this time so they can be "carved out" of the terms of this agreement.

If there is any relationship, plans or potential conflicts that the IC is engaged in or contemplating now, disclose them below or indicate that there are "No relationships or Known Conflicts"

no conflicts
_____
_____
_____
_____

**Nondisclosure Agreement.**

The IC agrees to not discuss what they know or learn about the company, its principles, staff, systems and its operations with anyone outside of the company without prior written approval by the company. Any media inquiries regarding the above named entities must be referred to the company at the time they are made without delay and before they give any comments.  The IC may NOT speak on behalf of the company at any time without prior written approval and consent of the company.

The IC agrees that the information the company has revealed and will reveal and expose the IC to is substantial and valuable. The IC understands and agrees that if the IC were to use that information to create a competing company that would cause considerable and irreparable harm to the company. If that were to occur the IC agrees to compensate the company in full for those losses and to cease and desist operations in the future that are found to be in violation of the agreement.

To determine the value and  extent of such a loss, The IC and the company agree to be bound by the determination of an Arbitrator.  Each party will cover their own expenses in defense or prosecution of any determination of damages. Any  party who substantially prevails (giving due consideration to all relevant circumstances and not merely to  which party obtains a judgment or recovery in its favor) in asserting or defending a claim arising out of this  agreement shall be awarded its costs, fees, and expenses, including reasonable attorney's fees and costs.

**Non Competition Clause.**

The company is in the business of training, coaching and consulting people that want to learn about various topics.  The company has spent considerable money and effort to build the company and is endeavouring to protect its interests.  The company does not want to compete with the IC in relationship to education, coaching or consulting.

In exchange for the commissions the company will pay to the IC the IC agrees to not compete with the company by offering directly or indirectly, any educational, coaching or consulting offering on the topic of shared housing, senior housing or co-housing or related topics.

This Non compete provision will continue for a period of 2 years after the last payment made by the company to the IC for the use of the information as described in this agreement.

**IC providing education, coaching or consulting outside of this agreement**

The company will be investing considerable time, money and resources to create the product and to promote the offerings that are created. It is important that the IC protect the company when someone attempts to circumvent the company and approaches them directly.

From time to time an individual may approach the IC and ask them if they will provide education, coaching or consulting directly. This would be an attempt to bypass the company. The IC agrees to immediately refer that person directly to the company. The company will endeavour to provide the education, coaching or consulting and then compensate the IC according to the terms of this agreement.

**By signing below you are agreeing to the terms of the agreement above.**

*Frank Candelario*        1-7-21

SIGNATURE OF INDEPENDENT CONTRACTOR DATE

_____        2-2-21

SIGNATURE OF THE COMPANY REPRESENTATIVE DATE

# **EXHIBIT 3**

# INDEPENDENT CONTRACTOR AGREEMENT - Frank and Sherri Candelario

This is a blanket agreement covering the business entities listed below and any future companies that are created, owned or controlled by the Guarino family, including but not limited to: RAL Academy, AL Family, Family Legacy Homes, AL Network, Shared Housing Academy, Pitch Masters Academy, RAL National Convention, RAL Summit, RAL National Association. The companies above are referred to as the "Company"

Name of the Independent Contractor (IC) _Sherri Candelario_

Name of the IC's Company if any _Shared Housing Solutions, LLC_
Primary Mailing Address _24030 SE 258th Ln, Maple Valley, WA 98038_

Email Addresses _sherri.candelario2014@gmail.com_
Telephone Contact Numbers _206-743-5649_

SS# OR EIN if a Business _82-0855605_

PAYMENTS ARE TO BE MADE OUT TO:
_Cardiff Cove Management- Sherri Candelario_

PAYMENTS ARE TO BE MAILED TO:
_24030 SE 258th Ln Maple Valley, WA 98038_

The purpose of this agreement is to outline the creation, use and sale of a Shared Housing suite of products and offerings. This will include a Shared Housing Home Study Course, a 3-Day Shared Housing training, a coaching / support product, a continuation of support and a limited license to use the name "Kate's House Foundation or Kate's House" or any derivative of that name. Additional products and services may be offered in the future as well.

Initially, a powerpoint and a webinar will be created and used for promotional purposes by the company with the help and assistance of the IC.

A "Shared Housing Home Study Course" or "SH-HSC" will be created and produced by the Company with the assistance of the IC, using the presentation and information provided by the IC. The company will own the recording and the product they create based on that content and the IC will be compensated for the use of that information in the following manner:

1- 10% of the net amount collected by the company for the sale of the SH-HSC will be paid by the company to the IC. "Net amount" means after any merchant fees and any marketing partner's

revenue share is deducted.  When the home study course is included as a bonus or as a part of the class, the 10% paid to the IC will apply to the portion designated by the company as the value assigned for the home study course.

**2- IC will be paid $5,000 for being the primary instructors and trainers when presenting and teaching at a live 3 day training, in person or online.** Any and all expenses required to present in person or online will be the responsibility of the IC including but not limited to travel and lodging.

**3- IC will be paid a 10% commission on the direct sale of a coaching or consulting support product they complete during the Live 3 day training.** A "completed sale" means that during a live 3 day presentation that the IC is the primary presenter, an attendee of that presentation registers for and makes a significant deposit for a support product. A "significant deposit" will be determined by the company but is generally at least 20% of the total price.   The company will then do their best to collect the balance due and will pay the 10% on the net amount of the amount collected from those sales for up to 30 days after the sale is made.

**4- The IC will be responsible to provide the coaching and or consulting (support) that is sold and will be paid 20% of the net amount collected for that support.** That support can be provided by phone, computer or email.  The IC is responsible for any cost incurred or required to provide that support.  IE: phone, internet, staffing if they decide to use other people to provide that support.  If the IC does not provide high quality, timely  support, as determined by the company,  the company reserves the right to use an alternative method or resource to fulfill this support with no compensation being paid to the IC.

**5- After the initial support has ended, additional monthly support will be offered to the students for $500 per month. The IC will receive 80% of the net collected and the company will retain 20%.**

**6- If a student uses the "Kate's House Foundation" name or a derivative of it, they will be charged $200 a month for the use of the name. The IC will receive 80% of the net collected for the use of the name** and the company will receive 20% of the net collected.

**FOR ANY REFUNDS, COMMISSIONS WILL BE CLAWED BACK TO IC AGAINST FUTURE SALES COMMISSIONS.**  If there is a refund at any time in the future, any commissions paid to the IC will be charged back to the IC against future commissions to be paid. This is a rare event because we have a policy of selling to those that we feel are the proper candidates for this investment.

As a company,  we would rather not take a sale that we feel has a high probability of refunding later. We never want to  get in the way of someone's personal commitment level BUT we will not take or accept a sale if we feel it is  NOT in the best interest of the student. The company may decide to refund a client well after the expiration date of any refunds. If that happens, the commissions paid on those sales will be deducted

from future sales of the IC on a case by case basis. It's a very rare occurrence but it will help us all in the long run.

**This is not an employee/employer relationship** and the company is not promising any specific work or specific schedule at this time. Any taxes that you may be responsible for as an affiliate/independent contractor will be your sole responsibility and you will hold the company harmless regarding the payment of any taxes that you may be required to pay for the income or benefits that you receive from the company.

The IC may already have consulting arrangements with some people at the time this agreement is signed. The company is not requiring the IC to discontinue those obligations. Any one that the IC is currently consulting needs to be disclosed at this time so they can be "carved out" of the terms of this agreement.

If there is any relationship, plans or potential conflicts that the IC is engaged in or contemplating now, disclose them below or indicate that there are "No relationships or Known Conflicts"

No conflicts
_____
_____
_____
_____

**Nondisclosure Agreement.**

The IC agrees to not discuss what they know or learn about the company, its principles, staff, systems and its operations with anyone outside of the company without prior written approval by the company. Any media inquiries regarding the above named entities must be referred to the company at the time they are made without delay and before they give any comments. The IC may NOT speak on behalf of the company at any time without prior written approval and consent of the company.

The IC agrees that the information the company has revealed and will reveal and expose the IC to is substantial and valuable. The IC understands and agrees that if the IC were to use that information to create a competing company that would cause considerable and irreparable harm to the company. If that were to occur the IC agrees to compensate the company in full for those losses and to cease and desist operations in the future that are found to be in violation of the agreement.

To determine the value and extent of such a loss, The IC and the company agree to be bound by the determination of an Arbitrator. Each party will cover their own expenses in defense or prosecution of any determination of damages. Any party who substantially prevails (giving due consideration to all relevant circumstances and not merely to which party obtains a judgment or recovery in its favor) in asserting or defending a claim arising out of this agreement shall be awarded its costs, fees, and expenses, including reasonable attorney's fees and costs.

**Non Competition Clause.**

The company is in the business of training, coaching and consulting people that want to learn about various topics. The company has spent considerable money and effort to build the company and is endeavouring to protect its interests. The company does not want to compete with the IC in relationship to education, coaching or consulting.

In exchange for the commissions the company will pay to the IC the IC agrees to not compete with the company by offering directly or indirectly, any educational, coaching or consulting offering on the topic of shared housing, senior housing or co-housing or related topics.

This Non compete provision will continue for a period of 2 years after the last payment made by the company to the IC for the use of the information as described in this agreement.

**IC providing education, coaching or consulting outside of this agreement**

The company will be investing considerable time, money and resources to create the product and to promote the offerings that are created. It is important that the IC protect the company when someone attempts to circumvent the company and approaches them directly.

From time to time an individual may approach the IC and ask them if they will provide education, coaching or consulting directly. This would be an attempt to bypass the company. The IC agrees to immediately refer that person directly to the company. The company will endeavour to provide the education, coaching or consulting and then compensate the IC according to the terms of this agreement.

**By signing below you are agreeing to the terms of the agreement above.**

_Sherri Candelario_                    1-7-21

SIGNATURE OF INDEPENDENT CONTRACTOR DATE

_[signature]_                    2-2-21

SIGNATURE OF THE COMPANY REPRESENTATIVE DATE

# **EXHIBIT 4**

November 11, 2021 Electronic Recording

(To Be Submitted to the Clerk)

# EXHIBIT 5



Stacia R. Hofmann, Attorney
206-693-2718
stacia@cornerpointlaw.com

**VIA EMAIL AND PRIORITY MAIL**

November 19, 2021

Emmanuel Guarino, Chief Executive Officer
Isabelle Smith, Chief Operating Officer
Mona Guarino
Residential Assisted Living Academy
315 W. Elliot Rd., Suite 107-605
Tempe, AZ 85284

RE:  Sherri Candelario and Frank Candelario
     *Termination Letter*

Dear Mr. Guarino, Ms. Smith, and Ms. Guarino:

Please be advised that I represent Sherri Candelario, Ph.D., ("Sherri") and Frank Candelario ("Frank") as it relates to their independent contractor agreements with Residential Assisted Living Academy ("RAL Academy").

Upon RAL Academy's urgent requests for Sherri and Frank to immediately terminate their agreements after RAL Academy founder Eugene Guarino's ("Gene") unexpected passing last month, Sherri and Frank hereby submit this termination letter. It has been a very difficult time, and it is clear that absent Gene's involvement, the independent contractor agreements have been irreversibly frustrated and no longer serve their purposes.

### TERMINATION DATE

Sherri and Frank agree to a termination date of November 19, 2021. They revoke any and all licenses or alleged licenses effective immediately.

### TERMINATION OF SERVICES

Since Gene's passing, new leadership at RAL Academy has attempted to control how Sherri and Frank speak, teach, coach and mentor. The United States Supreme Court and the Washington Supreme Court have, for decades, recognized that "an independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." *Logue v. United States*, 412 U.S. 521, 527 n.5 (1973); *Hollingbery v. Dunn*, 68 Wn.2d 75, 79-80, 411 P.2d 431 (1966).

Mailing Address:
PMB 210
10002 Aurora Ave. N. #36
Seattle, WA 98133

Sherri's and Frank's independent contractor relationships do not allow the level of control that RAL Academy is now trying to assert. In light of this, and the mutual termination of the agreements, the December Recovery Housing Academy virtual course offered by RAL Academy should be cancelled, and RAL Academy should transfer its active students to other coaches. Sherri and Frank should not be providing any further services, and the relationship should be severed immediately.

Furthermore, Sherri and Frank **do not** consent to further presentation or use of their names, images, videos, trademarks, materials or other intellectual property owned by Sherri, Frank, their various businesses, and Kate's House Foundation®. Effective as of this termination date, all licenses and rights to use any such materials, the names or likenesses of Sherri and Frank, or the trademarks owned by them or Kate's House Foundation® are revoked. Indeed, RAL Academy will or has received a separate letter from intellectual property counsel for Kate's House Foundation®, Sherri, and Frank providing more details on this prohibition against further use of these intellectual property rights owned by Sherri, Frank, their various businesses, and/or Kate's House Foundation®.

## ALLEGED NONCOMPETITION COVENANT

In January 2020, the Washington legislature expanded protection from unreasonable noncompetition clauses to independent contractors. Companies that require independent contractors to sign unenforceable noncompetition clauses, or who try to enforce or even partially enforce illegal noncompetition clauses, are liable to independent contractors for damages and must also pay independent contractors their attorneys' fees. The alleged noncompetition clauses in Sherri's and Frank's contracts are void and unenforceable. RCW Ch. 49.62; *see also Copier Specialists, Inc. v. Gillen*, 887 P.2d 919, 76 Wn. App. 771 (1995).

We trust that the above is an agreeable resolution and that the parties can immediately go their separate ways. If you would like to discuss the contents of this letter, please contact me directly rather than contacting Sherri or Frank. Sherri and Frank hope for healing as they keep Gene's warmth in their thoughts and memories.

Very truly yours,

Stacia Hofmann

cc:   Jim Guarino (via email only)
      David Guarino (via email only)
      Sherri Candelario, Ph.D.
      Frank Candelario
      Stephen Horace

Mailing Address:
PMB 210
10002 Aurora Ave. N. #36
Seattle, WA 98133

**EXHIBIT 6**

 Gmail

**Victoria Fitzpatrick <victoria@ralacademy.com>**

---

## Fwd: Your purchase at OREIA
1 message

---

**Isabelle Guarino** <isabelle@ralacademy.com>                     Wed, Nov 24, 2021 at 8:07 AM
To: Victoria Fitzpatrick <victoria@ralacademy.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Anera Shell <anera@realliferealestate.com>
> **Date:** November 23, 2021 at 8:16:15 PM MST
> **To:** Isabelle Guarino <isabelle@ralacademy.com>, Vena Jones-Cox <vena@therealestategoddess.com>
> **Subject: Fwd: Your purchase at OREIA**
>
>
> ---------- Forwarded message ---------
> From: **Sherri Candelario** <kates.house.shorewood2016@gmail.com>
> Date: Tue, Nov 23, 2021, 9:37 PM
> Subject: Re: Your purchase at OREIA
> To: Frank Harris <378howellavenue@gmail.com>, <anera@realliferealestate.com>
>
>
> Hi Frank:  We shared with Anera that this is not a business issue between us and Shared Housing Academy.
> Isabelle Guarino requested we terminate our contract last week.  There is a lot going on in the family and the
> business after the death of their dad. We have no visibility into why they needed to cut ties, but we know it
> would not have happened if Gene had not died unexpectedly.  Frank, Gene and I had big plans to go national
> with the model of shared housing Frank and I created.
>
> We have been teaching this class for many years and will teach independently in 2022.  We would like to have
> you on our mailing list and stay in touch.  We will help you.
>
> Kind regards, Sherri
>
>
> Kind regards,
>
> Kate's House Foundation
>
> Frank and Sherri Candelario, Ph.D.
>
> visit us at:
>
> www.kateshousefoundation.org
>
> follow us on Facebook:  https://www.facebook.com/KatesHouses/
>
> Frank (760) 907-9068
> Sherri (206) 743-5649
>
>
> On Tue, Nov 23, 2021 at 9:06 PM Frank Harris <378howellavenue@gmail.com> wrote:
>> Sherri,
>>
>> Hi, I just received the email below which is untimely and unfortunate because I had a business plan to put
>> together to purchase a property I was looking to purchase in my neighborhood and how to better manage and

renovate my current triplex.

I currently live in the two bedroom first floor, and the second floor has one tenant in a two bedroom paying $1200 and third floor has one tenant paying $450 for a one bedroom. In total this is only making me $1640 and it is not cash flowing because I live on the first floor. My plan to move out in one year. Goal is to rent the finished basement to two people and add another master bedroom bath on the first. With two tenants per bedroom, all this will allow for 2 people in the basement, 4 people in the first floor and 4 people in the second floor and 2 people in the third for a total of 12 tenants possible. Now, all this planning also needs more information to proceed.

I am also looking at property nearby that can accomodate +20 people in a Class A fantastic residence. In a nutshell, I have two instances above where I need to learn the intricacies of placing people of need their housing.

Can you help me with this predicament I am in?

Mahalo,

Frank Harris, MD


On Mon, Nov 22, 2021 at 1:27 PM Anera Shell Integrator <anera@realliferealestate.com> wrote:

Hello,

Unfortunately, because of a business issue between the Calendario's and the Shared Housing academy, we will not be able to fulfill your purchase of this course. We are mailing out refund checks today for the full price of your purchase. Please allow at least a week to receive your check as we cannot control the post office and the Thanksgiving Holiday may impact delivery times.

You will also be receiving an email from Isabelle Guarino giving you more information.

On OREIA's behalf, I am very sorry that we were unable to deliver this product to you. We strive very hard to have a conference where we sell speaker products that we can stand behind, and, are sorry, that in this case, circumstances beyond our control prevented us from being able to live up to this ideal.

Please feel free to contact me if you have any questions, or if you have not received your refund check by next week.

Anera Shell

Treasurer, OREIA Convention


--
Anera Shell CPA
Integrator to the Goddess
Proffitt Real Estate Services Inc.
3707 Warsaw Avenue
Cincinnati OH 45205

513-673-7158
513-672-2226 fax

National Real Estate Summit 11/4-11/7/2021

# EXHIBIT 7



Victoria Fitzpatrick <victoria@ralacademy.com>

## Fwd: Shared Housing Academy
1 message

**Isabelle Guarino** <isabelle@ralacademy.com>                    Wed, Nov 24, 2021 at 8:08 AM
To: Victoria Fitzpatrick <victoria@ralacademy.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Anera Shell <anera@realliferealestate.com>
> **Date:** November 23, 2021 at 8:15:59 PM MST
> **To:** Isabelle Guarino <isabelle@ralacademy.com>, Vena Jones-Cox <vena@therealestategoddess.com>
> **Subject: Fwd: Shared Housing Academy**

---------- Forwarded message ---------
From: **Sherri Candelario** <kates.house.shorewood2016@gmail.com>
Date: Tue, Nov 23, 2021, 9:33 PM
Subject: Shared Housing Academy
To: <anera@realliferealestate.com>

Hi Anera:

Frank and I really enjoyed meeting you and your sister.  We have to correct a grave misconception about  why the SHA class is not being offered.

We did not have a business issue with RAL.  We were terminated and we believe it is due to a restructuring that was required by the company following Gene's passing.  We have no information as to why it happened as we had a full class for December.   Please see the attachment email below from Isabelle Guarnio requesting we terminate.

We cannot and will not be blamed for RAL's decisions, particularly when we have no knowledge as to why they are making business decisions that affect our ability to fulfill our commitments.

We received the email from Frank Harris stating there was a business issue.   There was no business issue. **RAL asked Frank and I to terminate our consulting agreement with RAL last week.   We did not quit.  We were fired.  Please see Isabelle's request in italics.**

Please have any students call us if there are questions.   We created the class and all of the materials.  We will likely offer a training independently in 2022.

We have no visibility into their business, probate issues or even if this is due to grief over the loss of their parent.

We too, were blindsided.  Kind regards, Sherri and Frank

On Mon, Nov 22, 2021 at 1:27 PM Anera Shell Integrator <anera@realliferealestate.com> wrote:
> Hello,
>
> Unfortunately, because of a business issue between the Calendario's and
> the Shared Housing academy, we will not be able to fulfill your purchase
> of this course. We are mailing out refund checks today for the full

price of your purchase. Please allow at least a week to receive your
check as we cannot control the post office and the Thanksgiving Holiday
may impact delivery times.

Kind regards,

Kate's House Foundation

Frank and Sherri Candelario, Ph.D.

visit us at:

www.kateshousefoundation.org

follow us on Facebook:  https://www.facebook.com/KatesHouses/

Frank (760) 907-9068
Sherri (206) 743-5649

---

**RALA Mail - Checking in termination request.pdf**
88K

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| RECOVERY HOUSING ACADEMY, LLC, an Arizona limited liability company; RAL ACADEMY, LLC, an Arizona limited liability company; MONA GUARINO; and ISABELLE SMITH, | Case No. CV2021-054227 |
| | **ORDER TO SHOW CAUSE** |
| Plaintiffs, | (Assigned to the Honorable Timothy J. Thomason) |
| v. | |
| FRANK CANDELERIO and SHERRI CANDELERIO, husband and wife; SHARED HOUSING SOLUTIONS, LLC, | |
| Defendants. | |

This matter came before the Court on Plaintiffs' Motion for Order to Show Cause. The Court has received and considered Plaintiff's Verified Complaint and Application for Temporary Restraining Order and Preliminary Injunction and related exhibits in this action.

IT IS HEREBY ORDERED granting Plaintiffs' Motion for Order to Show Cause.

IT IS FURTHER ORDERED that Defendants Frank Candelerio and Sherri Candelerio, and Shared Housing Solutions, LLC appear Telephonically before this Court on December 15, 2021, at *2:00 p.m.*, then and there to show cause, if any there be, why a temporary restraining order and preliminary injunction should not issue as prayed for in Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction and Verified Complaint in this action.

1  The parties shall call 602-506-9695 to access the
2  Conference Bridge. (The long distance toll free number is 1-
3  855-506-9695). The system will prompt you to enter the
4  conference pass code. Enter the code 3728495 followed by the
5  # (pound) sign. If disconnected for any reason, repeat
6  instructions above. Note: Participants who call in prior to
7  the Moderator (Court staff) opening the bridge will hear music
8  while waiting.

        This is a 15 minute hearing to determine if a Temporary Restraining Order should
be entered and to schedule an Evidentiary Hearing.  No evidence will be taken.   The
Complaint, Motion for Order to Show Cause and this Order must be served by no later than
5:00 p.m. on Friday December 10, 2021.

        DATED this _____ day of December, 2021.

                                          _____
                                          Hon. Timothy J. Thomason
                                          Superior Court Judge