**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Recovery Housing Academy LLC, et al., | No. CV-21-02133-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Frank Candelario, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs'[1] Application for Temporary Restraining Order ("TRO") and Preliminary Injunction. (Doc. 8.) Defendants[2] filed a Response, (Doc. 13), and Plaintiffs filed a Reply, (Doc. 17). The Court held oral argument on January 6, 2022 in order to determine whether Plaintiffs were entitled to a TRO. After reviewing the pleadings and relevant law, the Court will now grant Plaintiffs' Application for a TRO.

**I.    BACKGROUND**

Plaintiffs seek a TRO and Preliminary Injunction enjoining Defendants from continuing to publish statements that Plaintiffs allege are false and defamatory.

Recovery Housing Academy, LLC ("RHA") and RAL Academy LLC ("RAL Academy") are Arizona companies which are owned and operated by Mona Guarino and her adult children, including Plaintiff Isabelle Guarino. (Doc. 8 at 2–3.) RHA teaches

---

[1] For the purposes of this Order, Plaintiffs refers to Recovery Housing Academy, LLC, RAL Academy, LLC, Mona Guarino, and Isabelle Guarino.

[2] For the purposes of this Order, Defendants refers to Frank Candelario, Sherri Candelario, and Shared Housing Solutions, LLC.

people how to invest in real estate by owning and operating clean and sober living homes. (*Id.* at 3.) RAL Academy teaches people how to own and operate single family homes as residential assisted living for seniors. (*Id.*) Plaintiff Mona Guarino's husband, Gene Guarino, was the founder and manager of each of the businesses until he passed away from COVID-19 complications on October 13, 2021. (*Id.*)

On February 21, 2021, RHA and RAL Academy entered into an independent contract agreement (the "Agreement") with Defendants. (*Id.*) The purpose of the Agreement was "to outline the creation, use and sale of a Shared Housing suite of products and offerings." (*Id.*) Pursuant to the Agreement, RHA paid Defendants $5,000 to present a live three-day training course. (*Id.* at 4.) Additionally, RHA paid Defendant commissions on revenue received from Plaintiff's products purchased by training course attendees and a percentage of revenue received from the Defendants' coaching and consulting sold by Plaintiffs. (*Id.*) Defendants repeated the independent contractor services for Plaintiffs under the Agreement in May, July, and August 2021. (*Id.* at 4.)

After Gene Guarino died from COVID-19 complications on October 13, 2021, the relationship between Plaintiffs and Defendants deteriorated. Plaintiffs allege that on November 11, 2021, despite having already been paid to perform coaching and consulting for Plaintiffs' customers under the Agreement, Defendants unilaterally refused to perform the work they had contracted to perform and had been paid for. (*Id.*) On a November 11, 2021 recorded Zoom call, Sherri Candelario stated to Plaintiffs Mona and Isabelle Guarino that the Agreement didn't work for the Candelario Defendants and "we're just not doing it anymore." (*Id.* at 4–5; Ex. 4.) Sherri Candelerio reiterated on at least six occasions during the Zoom call that the Candelerios wanted out of their agreement with Plaintiffs. (Doc. 25-2 at 10, 11, 12, 14, 17, & 23.) Based on Sherri Candelario's insistence on getting out of the contract, Plaintiff Isabelle Guarino suggested the parties take a "pause" on 2022 and asked if the Candelarios would like to write up a termination letter. (*Id.* at 16, 32.) During the Zoom call, Sherri Candelario agreed that Defendants would fulfill their commitment to lead the three-day class they had previously agreed to perform. (*Id.* at 15–16, 23–24, 26,

32–33.)

On November 19, 2021, the Candelario Defendants, through counsel, submitted a termination letter to Plaintiffs which stated that Gene Guarino's passing had "irreversibly frustrated the agreement. (*Id.* at 5, 34; Ex. 5.) In the letter, Defendants unilaterally set a termination date of November 19, 2021—prior to the December seminar Defendants had agreed to speak at on the Zoom call. On November 23, 2021, Defendant Sherri Candelario sent separate emails to one of Plaintiffs' customers and an industry leader that allegedly contained false statements. (*Id.* at 5, 37–41.) In the email to the industry leader, Sherri Candelario wrote that the Plaintiffs terminated the Candelario's, that the Candelario Defendants had no information about what happened, that they had no knowledge as to why Plaintiffs were making business decisions that affected their ability to fulfill their commitments, that they did not quit but were fired, and they would offer training independently in 2022. (*Id.* at 40; Ex. 7.) Plaintiffs allege that each of these assertions are false. Additionally, Plaintiffs allege false assertions that Sherri Candelario made in an email to one of Plaintiffs' customers. In the email, Sherri Candelario wrote:

> Hi Frank: We shared with Anera that this is not a business issue between us and [SHA]. Isabelle Guarino requested we terminate our contract last week. There is a lot going on in the family and the business after the death of their dad. WE have no visibility into why they needed to cut ties, but we know it would not have happened if Gene had not died unexpectedly. Frank, Gene and I had big plans to go nation with the model of shared housing Frank and I created.
>
> We have been teaching this class for many years and will teach independently in 2022. We would like to have you on our mailing list and stay in touch. We will help you.

(Id. at 37; Ex. 6.) Plaintiffs allege that many of the statements made in the email are false.

Plaintiffs contend that Defendants' allegedly false statements have caused them financial and reputational harm. As of December 3, 2021, Plaintiffs alleged that they had been forced to refund $182,139 to students following the allegedly false statements. (Doc.

- 3 -

17 at 2.) At the time they filed their Reply, Plaintiffs allege that refunds are now at $355,457.12. (*Id.*) Plaintiffs also contend that three other independent contractors have severed ties with their businesses. (Doc. 8 at 5.)

Plaintiffs allege that they have a high likelihood of success on the merits for their claims for intentional interference with contract and prospective contractual relations, defamation, false light, injurious falsehood, intentional infliction of emotional distress, and breach of the covenant of good faith and fair dealing. (*Id.* at 7–11.)

## II. LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. The analysis for granting a TRO is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *Cochran v. Rollins*, No. CV07-1714-PHX-MHMJRI, 2008 WL 3891578, at *1 (D. Ariz. Aug. 20, 2008). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction or TRO must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions"

variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

## III. ANALYSIS

Plaintiffs contend that they have a strong likelihood of success on the merits for their claims. The Court will analyze the claims after addressing Defendants' arguments regarding the Uniform Publication Act and Prior Restraint of Speech.

### A. Uniform Publication Act

As an initial matter, Defendants argue that the Uniform Publication Act (the "Act") precludes the Court from granting the TRO. The Court does not agree. The Act provides:

> No person shall have more than one cause of action for damages for libel, slander, invasion of privacy or any other tort founded upon a single publication, exhibition or utterance, such as any one edition of a newspaper, book or magazine, any one presentation to an audience, any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

A.R.S. § 12-651(A). The Act is meant to prevent multiple suits from republications or sale of the same material. *See Larue v. Brown*, 235 Ariz. 440, 444, 333 P.3d 767, 771 (Ct. App. 2014). The Act does not preclude multiple theories of recovery or claims to be brought in the same lawsuit. *See Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 963 (9th Cir. 2013). Thus, the Act does not preclude the Court from granting the TRO.

### B. Prior Restraint on Speech

Defendants contend that Plaintiffs' Application seeks a prior restraint on Defendants' speech and, thus, is subject to higher scrutiny under the First Amendment. (Doc. 13 at 7.) Indeed, the Ninth Circuit has noted that issuing a preliminary injunction against speech based on its falsity would create significant risks to the First Amendment. *See Overstreet v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1506*, 409 F.3d 1199, 1218 (9th Cir. 2005). However, as Plaintiffs point out, at least one court in this district has entered a preliminary injunction prohibiting defendants from defaming or

otherwise harassing plaintiffs and the individuals who provide business services to them. *See Xcentric Ventures, LLC v. Stanley*, No. CV-07-00954-PHX-NVW, 2007 WL 2177323, at *1 (D. Ariz. July 27, 2007). Thus, courts routinely grant TROs restricting speech that is not merely false, but defamatory.

### C. Likelihood of Success on the Merits

#### 1. Intentional Interference with Contract and Perspective Contractual Relations.

In order to establish a *prima facie* case of intentional interference with a contractual relationship, a Plaintiff must show: (1) the existence of a valid contractual relationship or business expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Hill v. Peterson*, 35 P.3d 417, 420 (Ariz. Ct. App. 2001).

Here, Plaintiff has not shown a likelihood of success on the merits for these claims. Plaintiffs have not shown that they can satisfy the third element of the claim. They have not shown that Defendants' allegedly false statements caused the breach or termination or the contract or expectancy. This is particularly true for the email to the customer because the customer may have simply canceled because Plaintiffs were unable to give the presentation, not because of Defendants' statements. Likewise, there is no evidence that the independent contractors terminated their relationship with Plaintiffs due to the statement in Defendants' email. Thus, at this time, Plaintiffs have not shown a likelihood of success on the merits for this claim.

#### 2. Defamation

In order to show a claim for defamation, "a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Dube v. Likins*, 167 P.3d 93, 105–06 (Ariz. Ct. App. 2007) (quoting *Turner v. Devlin*, 848 P.2d 617, 624 (Ariz. 1984)) (internal quotation marks omitted). A person may be liable for what he or she insinuates as well as what he

or she says explicitly. *Phoenix Newspapers, Inc. v. Church*, 447 P.2d 840, 846 (Ariz. 1968).

In this case, Defendants spend a lot of time arguing that the statements made by Sherri Candelario are true and thus, there can be no defamation. However, upon review of the transcript of the call on November 11, 2021, the Court cannot agree. From the very beginning of the call, it is Ms. Candelario who seeks to terminate the relationship. She made it very clear that defendants did not want to continuing doing business with Plaintiffs in the absence of Gene. Best case scenario, one could argue that this was a mutual agreement to terminate the relationship, but they were not fired. Additionally, the parties discussed completing the December event but when Defendants' sent over their termination letter, they unilaterally set the termination date at November 19, 2021, which further evidences their intent to terminate the relationship. The transcript also makes it clear that Defendants were not "blindsided" by the fact that their work relationship ended and that there were business issues between the parties. So Ms. Candelario's statements that they were blindsided and there were no business issues between the parties are false. Additionally, the false statements in the emails likely damaged the reputation of Plaintiffs' businesses because the statements made it sound like it was Plaintiffs' fault for canceling the December event. Accordingly, the Court finds that the statements had the effect of impeaching Plaintiffs' reputation. Thus, Plaintiffs have shown a likelihood of success on the merits of this claim.

### 3. False Light Invasion of Privacy

False light invasion of privacy protects against the conduct of knowingly or recklessly publishing false information or innuendo that a reasonable person would find highly offensive. *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 786 (Ariz. 1989). "The standards for proving false light invasion of privacy are quite 'stringent' by themselves." *Id.*

As discussed above, Plaintiffs are likely to be able to show that the statements are false. However, these are not the type of statements that a reasonable person would find

highly offensive. Accordingly, at this time, Plaintiffs have not shown a likelihood of success on the merits on this claim.

### 4. Injurious Falsehood

Arizona recognizes a claim for injurious falsehood. *Aldabbagh v. Arizona Dep't of Liquor Licenses & Control*, 783 P.2d 1207, 1213 (Ariz. Ct. App. 1989). In order to bring a claim for injurious falsehood, a plaintiff must show that defendants made a publication of a matter derogatory to the plaintiff's business in general of the kind to prevent others from dealing with him or otherwise to interfere with his relations with others to his disadvantage. *W. Techs., Inc. v. Parcel, Inc.*, 739 P.2d 1318, 1321 (Ariz. Ct. App. 1986).

Here, it appears that Plaintiffs will not be able to satisfy the elements of injurious falsehood. The Defendants published statements to two third parties, some of which the Court has determined were false. There is evidence from the transcript of the Zoom call that Defendants knew that some of the statements that they published were false. There is evidence from which a reasonable person could determine that the false statements were made in an effort to deter the third parties from continuing to do business with the Plaintiffs. However, as to the last element, causation is lacking. There is no evidence from which the Court could conclude the Plaintiffs suffered pecuniary loss *due to* the false statements and not because the Plaintiffs could not hold the December event. Thus, at this stage, Plaintiffs cannot show a likelihood of success on the merits for this claim.

### 5. Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress are: (1) "the conduct by the defendant must be 'extreme' and 'outrageous'"; (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987). To satisfy the first element of this inquiry, a plaintiff must show that the conduct was so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community[.]" *Ford*, 734

P.2d at 585 (citation omitted).

Here, the statements made by Sherri Candalario cannot be characterized and extreme and outrageous. Additionally, there was no evidence presented that would support finding that severe emotional distress occurred. Therefore, at this time, Plaintiffs have not shown a likelihood of success on the merits of this claim.

### 6. Breach of the Implied Covenant of Good Faith and Fair Dealing

The law implies a covenant of good faith and fair dealing in every contract. *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986). The essence of the duty is that "neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.* at 569–70.

Defendants correctly point out that the statements at issue in Plaintiffs' Application did not arise until after Defendants terminated the contract on November 19, 2021. (Doc. 13 at 14.) Thus, the conduct at issue took place after the contract's termination. Further, Defendants argue that this claim is irrelevant to Plaintiffs' Application because it is a claim for which Plaintiffs can seek monetary relief. (*Id.*) The Court agrees with Defendants. Since the conduct took place outside of the time limitations of the contract, it cannot find that Defendants have violated the covenant of good faith and fair dealing. Therefore, at this time Plaintiffs have not shown a likelihood of success on the merits for this claim.

### D. Irreparable Harm

Plaintiffs have sufficiently presented evidence that the false statements would cause harm to their business interest and goodwill. Loss of goodwill supports a finding of the possibility of irreparable harm. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). Defendants' false statements in the two emails likely caused damage to the reputation of Plaintiffs' business because it made it sound like it was Plaintiffs' fault that the December event was cancelled. Accordingly, Plaintiffs have shown irreparable harm.

### E. Balancing of the Hardships

The balance of hardships tips in favor the Plaintiffs. While Plaintiffs will suffer

continuing harm to the reputation and goodwill of their businesses if Defendants are allowed to continue to make false statements about what happened with their independent contract agreement with Plaintiffs, Defendants will suffer little, if any, hardship in not being allowed to make false statements about the breakup to third parties. The TRO is sufficiently narrowly tailored. Thus, the Court finds that the balance of hardships favors Plaintiffs.

### F. Public Interest

Granting the TRO will advance the public interest. Courts have found that the public interest is served by protecting a company's right to business operations and contractual rights. *Compass Bank v. Hartley*, 430 F. Supp. 973, 983 (D. Ariz. 2006). Defendants' false statements in the two emails threatened that interest. Accordingly, the Court finds that granting Plaintiffs' Application for a TRO is in the public interest.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** granting Plaintiffs' Application for a TRO. (Doc. 8.)

**IT IS FURTEHRED ORDERED** that Defendants are enjoined from making any of the following false statements or statements similar to such statements:

1. That Plaintiffs terminated Defendants regarding their Independent Contractor Agreements.
2. That Defendants "did not quit. We were fired."
3. That Defendants "have no information as to why [the termination] happened."
4. That Defendants "have no knowledge as to why [Plaintiffs] are making business decisions that affect our ability to fulfill our commitments."
5. That Defendants "were blindsided" by their termination.

**IT IS FURTHER ORDERED** that the TRO will expire on January 17, 2022 unless extended by the Court.

**IT IS FURTHER ORDERED** setting a telephonic conference to discuss scheduling on February 14, 2022 at 10:30 a.m. The parties shall meet and confer prior to

the February 14, 2022 date and be prepared to discuss if the trial and Preliminary Injunction hearing can be consolidated.

Dated this 7th day of January, 2022.

Honorable Susan M. Brnovich
United States District Judge